Dittman v. Distilling Co. of America.

Henry I. Dittman et al.

*v.*

The Distilling Company of America et al.

[Filed March 28th, 1903.]

1. Under *Rev. L. of 1875 p. 6 § 10*, providing that corporations may be organized for certain specified purposes, "or any lawful business or purpose whatsoever," and Corporation act of 1896 (*P. L. of 1896 p. 294 § 51*), providing that corporations organized thereunder are authorized to hold shares of stock of any other corporation, a corporation created for the purpose of holding stock and controlling the operations of other corporations was organized for "a lawful purpose," and was entitled to purchase and hold such stock.

2. Where it was alleged that a corporation organized for the purpose of purchasing and holding stock in other corporations was illegal, as organized to create a monopoly, but such monopoly, if any existed, arose from the exercise of the powers conferred on the corporation by its charter or certificate of organization, such question could not be determined in a court of equity at the suit of a stockholder, but could only be considered on *quo warranto*, on relation of the attorney-general, to oust the corporation from its franchises.

3. Where it was alleged that a corporation authorized to purchase and hold stock in another corporation had created a monopoly, but such monopoly, if it existed, arose from the exercise of the corporation's power, expressly granted in its charter, to make contracts for the purchase of such stock, the exercise of such power could not be enjoined.

4. Where certain property of a corporation which was merged in another corporation, created for the purpose of holding and controlling the stock of such corporation and others engaged in the same line of business, was mortgaged to secure bonds, which were thereafter pledged to secure a loan on its becoming impossible to sell the bonds, which loan was negotiated to provide a working capital for all the constituent companies, and thereafter the holding company issued its own collateral bonds to raise money for the same purpose, a part of which had been loaned to the merged corporation as working capital, and on payment of which such corporation was entitled to a return of the bonds issued on security of the mortgage so executed, an allegation in a stockholders' action that the assets of the merged corporation were being improperly diverted, by reason of such mortgage, for the benefit of the holding company, was not sustained.

5. Where a corporation organized to hold and control the stock of other corporations negotiated a loan to obtain a working capital for the corpora-

Dittman *v.* Distilling Co. of America.

tions merged, one of the constituent companies, to which a portion of the money so raised was loaned, was properly charged with its proportion of the expenses incurred by the holding company in negotiating the loan.

6. Where money was loaned by a corporation holding a majority of the stock of various constituent corporations to one of such companies, neither the latter company nor its stockholders, prior to the repayment of the debt, was entitled to allege that the holding company had illegally charged such company with usury, in the form of additional expenses incident to making a loan and interest thereon.

7. Where, under an agreement between the holder of an option on certain distilling companies, which were to be sold to the K. company, the option-holder was entitled to apportion the consideration received from the K. company among the different grantors, and, under such reservation, a payment in cash and stock of the K. company was delivered to one of such grantors, such payment could not be questioned in a subsequent suit against a corporation into which the K. company was subsequently merged, on the ground that it constituted a misappropriation or a diversion of the K. company's assets.

8. Where a corporation was authorized to manufacture and sell whiskey and spirits, either at wholesale or retail, and to purchase the stocks of other corporations for such purpose, it had power to organize and hold the stocks of corporations in other states, through which it sold its manufactured product.

9. In the absence of evidence to the contrary, it must be presumed that the laws of West Virginia are similar to the laws of New Jersey, so as to authorize a corporation formed in New Jersey to exercise in West Virginia the powers conferred upon it by its charter and the laws of New Jersey.

10. Where a bill was brought against a corporation organized to hold and control the stock of other corporations to dissolve the same for illegality, and against the corporations whose stock was so held, a requested amendment to the bill alleging that complainants, as preferred stockholders of one of the constituent companies, were entitled to receive a stated quarterly dividend from the net profits of its business, and that such dividends had been accumulated, but not paid, and praying payment thereof, could not be allowed, since, as it affected but one of the parties to the suit, it would have rendered the bill multifarious.

---

Heard on bill, amended bill, answer, replication and proofs.

*Mr. John O. H. Pilney, Mr. Lindsay* and *Mr. Kremer* (of the New York bar), for the complainants.

*Mr. Richard V. Lindabury,* and *Mr. Mayer* (of the Chicago bar), and *Messrs. Alexander & Green* (of the New York bar), for the defendants.

EMERY, V. C.

In this case an original bill was filed August 17th, 1900; an amendment to the bill on March 6th, 1902, and on the argument, at the close of the proofs, an application for a further amendment to the bill was made. This application to amend is opposed. The issues raised upon the pleadings and proofs are substantially as follows: Complainants are owners and holders of preferred stock of the Kentucky Distilleries and Warehouse Company, organized under the laws of this state on February 3d, 1899. On July 11th, 1899, the Distilling Company of America was organized, also under the laws of this state. Among the designated objects for which this latter company was formed was (*Article Third* (*i*)) the purchase and holding of the shares of stock or property of other corporations of this state or elsewhere, and the operation of such properties, exercising the rights of owners of the stock, including the right to vote thereon. Although one of the objects for which it was organized was to manufacture, sell and distribute whiskey and spirits, the distilling company has not, in fact, engaged in such manufacture or sale, but is altogether a company holding the stocks of several constituent companies, thus managing or controlling the business of all the companies. These constituent companies are five in number, all engaged in the manufacture, sale or distribution of whiskies or spirits. They are the Kentucky Distilleries and Warehouse Company, the Spirits Distributing Company, the Standard Distilling and Distributing Company, three companies organized under the laws of New Jersey; the American Spirits Manufacturing Company, organized under the laws of New York, and the Hannis Distilleries Company, organized under the laws of Maryland. All of these companies are parties defendant to this suit, except the Hannis Distilleries Company. The distilling company is the owner of over ninety per cent. of the capital stock of each of these companies and of substantially all of the stock of the Hannis company. It became such owner by issuing its own shares for the purchase from the individual holders of the stock of the constituent companies, the relative values of the stock of the several companies and the amount of distilling company stock issued therefor being fixed by an agreement dated June 21st,

1899, called the "Deposit Agreement," under which stockholders in each of these companies desiring to sell their stock deposited it with a trust company, through which the deliveries or exchanges were carried out upon the subsequent incorporation of the distilling company. Complainant and other stockholders of the Kentucky company to the amount of about four thousand shares have not consented to exchange their preferred stock, but complainants have exchanged their common stock for like stock of the distilling company.

The grounds for relief set up in the original and amended bill which were relied on at the argument on final hearing may be classified as follows:

*First.* That the distilling company is not authorized, under its certificate of organization or under the laws of the State of New Jersey, to purchase and hold the stock of the Kentucky company or the other constituent companies for the purpose of controlling their operation.

*Second.* That one of the objects of the organization of the distilling company and of the transfer to it of the controlling interest in the stock of the constituent companies was the creation of a monopoly in the manufacture and sale of spirits, alcohol and whiskies; that such monopoly has been, in fact, created; that such monopoly is unlawful and renders the Kentucky company liable to the pains and penalties of the laws in restraint of monopoly and endangers its property.

*Third.* That the assets of the Kentucky company have been unlawfully and improperly diverted for the benefit of the distilling company.

*Fourth.* That the directors of the Kentucky company have unlawfully diverted its assets and property, by the organization and management of subsidiary companies, to which the Kentucky company has conveyed portions of its assets in consideration of stock in the subsidiary companies.

In reference to the *first* question, the authority of the distilling company to hold the stock of the Kentucky company and of the other constituent companies, and to act merely as a holding or operating company, the *status* of our legislation and decisions is as follows: Previous to 1893, corporations organized

under the General Corporation law [Revision of 1875] had no express statutory authority to purchase or hold the stock of other corporations or to vote thereon.   This revision of 1875 (section 10) specified the numerous purposes for which corporations might be organized, adding at the end of the specified purposes "or any lawful business or purpose whatever."   In *Ellerman* v. *Chicago Junction Railway Co., 4 Dick. Ch. Rep. 217 (Vice-Chancellor Green, 1891)*, it appeared that the junction company was incorporated to purchase, hold, sell, &c., and deal in the stock of a company called the transit company, incorporated under the laws of the State of Illinois, and also, in the promotion of its corporate business, to purchase the stock of any corporation, and in respect to it, exercise the rights and privileges of ownership.   The stock of the transit company, to the extent of about one hundred and thirty thousand of the entire one hundred and thirty-two thousand shares, was purchased by the junction company for about $22,600,000, the money being raised by the issue of bonds of the junction company (secured by the transit stock purchased) and the sale of about $12,500,000 of the entire capital stock ($13,000,000) of the junction company.   Ellerman, a stockholder of the junction company, filed a bill, attacking the validity of an agreement made by the junction company with Armour and others subsequent to the acquisition of his stock, one objection being that the company agreed to purchase the stock of a certain other company, the Tolleston company, a corporation of the State of New Jersey.   Vice-Chancellor Green held (at *p. 245*) that inasmuch as by its certificate of organization the corporate business of the Junction company was to acquire and deal in stock of the Transit company, and to do anything authorized by its charter to increase the value of this stock, and inasmuch as the purchase of the Tolleston stock was shown to have been for the purpose of increasing the value of the Transit company's business, it was within the power contemplated by the charter certificate. The right of the Junction company to purchase and hold the shares of the Transit company, the principal object of the creation of the company, was not questioned in the Ellerman suit (opinion, *p. 231*), and the validity of this purchase seems to

have been assumed by complainant as the basis of his own
claim (opinion, *p. 239*) that the right to purchase stock was by
the certificate limited to stock of the Transit company and could
not be extended to the stock of the Tolleston company. In the
subsequent suit brought by another stockholder of the Junction
company (*Willoughby* v. *Chicago Junction Railway Co., 5 Dick.
Ch. Rep. 656 (October, 1892)*), attacking the validity of the
same agreement which had been sustained in the *Ellerman Case,*
complainant attacked the validity of the incorporation of the
Junction company upon the ground that the purchase and hold-
ing of the stock of another company and the control of such
company was invalid and contrary to law. The conclusiveness
of the decree in the *Ellerman Case,* affirming the validity of the
agreement, was impeached by reason of the alleged collusive
character of that suit. Unless so impeached, the court held the
decree in the Ellerman suit to be conclusive upon this and other
points involved. Vice-Chancellor Green (at *pp. 675, 676*) and
Vice-Chancellor Van Fleet, who sat with him (at *p. 701*), de-
clined to consider the question of the right to organize a com-
pany for the purpose of holding stock of another company, upon
the grounds (1) that as a rule such questions can only be pre-
sented by the attorney-general acting on behalf of the state;
and (2) that the failure to raise this question in the Ellerman
suit (which was based on the validity of the incorporation) was
certainly not evidence of collusion in the Ellerman suit. The
decree in the Ellerman suit was therefore held to be conclusive
on the question as to all of the stockholders, as I understand
the opinion. After these decisions, and on March 14th, 1893,
a supplement to the Corporation act was passed (*P. L. of 1893
p. 301*) authorizing corporations organized under the act to
purchase and hold shares of stock of any other corporation of
this or any other state, and to exercise while such owners all the
powers, including the right to vote thereon, which natural per-
sons, as owners, could exercise. This provision was included in
the revision of 1896 as section 51 of the Corporation act, and
is the law now in force. In this revision of 1896 the previous
Corporation act was repealed, the specification of the purposes
of incorporation made in the previous acts was omitted, and in-

Dittman *v.* Distilling Co. of America.

corporation was authorized "for any lawful purpose or purposes whatever other than savings banks," and other specified purposes, such as railroads, canals, &c., not important for present purposes.

The ownership of stock and control of corporations by means of such ownership by either an individual or partnership is in general a lawful act, and the organization of a partnership for the purpose of such ownership and control, either alone or in connection with other objects, is unquestionably a lawful object or purpose of association of individuals. The only theory upon which the formation of corporations for the purpose of holding stock of other corporations can be held not to be a "lawful purpose," within the meaning of the act, is that an authority to own the stock and control the management of other corporations must be given expressly and in terms in the section authorizing the formation of companies in order to be lawful. This power to own and control stock of other corporations is expressly given, by a subsequent section, to all corporations when organized, and to the same extent as individuals; such ownership of stock is therefore a lawful act. This legislative declaration as to the lawfulness of the ownership of stock by corporations precludes the courts, as it seems to me, from declaring that such ownership cannot be included within the "lawful purposes" for which a corporation may be formed merely for the reason that it is not expressly and specially authorized in the section of the act defining the purposes of incorporation. What purposes are "lawful" within the meaning of this section must be ascertained by reference to the scope of the laws in force declaring the lawful character of acts, and taking the whole scope of the act it would seem that the ownership of stock in other corporations, either alone or in connection with other objects as the purpose of the corporation, is a purpose of incorporation authorized by the act.

I have considered this question as one which the complainants had the right to raise, on the assumption that, as owners of the Kentucky company stock, they might have the right to question the control of the Kentucky company by another corporation which had no right to hold or vote upon its stock. The *status* of the complainants may be different from that of the complain-

ants in the Ellerman and Willoughby suits, and these cases may, perhaps, not control this case upon this point.

But there are undoubtedly very grave difficulties as to the trial or settlement of this question in a suit like the present, or as to giving herein the appropriate relief, if the holding of the stock and control of the Kentucky company by the distilling company had been found to be illegal, and in this decision I do not intend to pass upon this question.

The *second* claim for relief is that one of the objects of the organization of the distilling company and of the transfer to it of the controlling interest in the stock of the constituent companies was the creation of a monopoly in the manufacture and sale of spirits, alcohol and whiskies, and that such monopoly has been created. This claim is not well founded, and for two reasons—*first,* the proofs fail to establish the monopoly charged, and *second,* the monopoly, if any exists, arises from the exercise of powers given by the charter or certificate of organization. Where no right of property in complainant is at stake, a court of equity has no power to declare unlawful the exercise by a corporation of the powers conferred by its charter, even though the purpose of the organization may have been unlawful. The right of the attorney-general, on behalf of the state, to question, in a court of equity, the exercise by a corporation of its powers under its charter for the purpose of creating a monopoly was expressly denied by Vice-Chancellor Reed, in *Attorney-General* v. *American Tobacco Co., 10 Dick. Ch. Rep. 352, 369, &c. (1897),* and his opinion was adopted on appeal. *S. C., 11 Dick. Ch. Rep. 847 (1898).* In this suit also the right of an individual to equitable relief was denied. *S. C., 10 Dick. Ch. Rep. 378.*

The reason upon which this decision, as to want of equitable jurisdiction, is based is that any order or decree of a court of equity restraining a corporation exercising private, and not public or *quasi* public, franchises from acts which are within the powers conferred by its charter or certificate of incorporation is, *pro tanto,* an annulment of its charter. It is therefore, to that extent, an ouster from its franchises, and such ouster is rightful and legal only when made by judgment upon *quo warranto,* a proceeding brought to test the very question on behalf of the

state in the supreme court, which has, under the constitution, exclusive jurisdiction. *Attorney-General* v. *American Tobacco Co., 10 Dick. Ch. Rep. 367.* This rule does not prevent a court of equity from restraining *quasi* public corporations from acts beyond their corporate powers, where such acts involve a public nuisance or other public injury. *Ibid., 366.* This decision is conclusive upon the right of the complainants to raise the question that the effect of the charter and acts under it are to create a·monopoly.

If, however, it should be considered that this question is now properly before the court for determination, the decision of the court of errors and appeals in *Trenton Potteries Co.* v. *Oliphant, 13 Dick. Ch. Rep. 507 (1899),* would seem to be fatal to the complainants' contention. It was expressly decided in that case (see *pp. 524, 525*) that where a monopoly results, or may result, from the exercise of the powers of making contracts expressly granted by the legislature to corporations, such exercise of ,powers cannot be enjoined. This is upon the ground that the legislature granting the powers must be taken to have made a final and authoritative decision upon the question of public policy as to the creation of the monopoly thus resulting.

The *third* claim for relief is the unlawful and improper diversion of the assets of the Kentucky company for the benefit of the distilling company. The only specific charge of such diversion of assets made in the bill was in paragraph 12, which charged that the directors of the Kentucky company, acting under the control of the distilling company, on or about January 1st, 1900, caused a mortgage or trust deed of $5,000,000 to be executed by the Kentucky company upon all its property and assets, present and future, to secure bonds of that amount, and that, contrary to the usual course of business and contrary to the interests of the Kentucky company, considerable portions of these bonds were hypothecated by the directors of the Kentucky company (five of its seven directors being also directors of the distilling company), and have been pledged in the proportion of $1,000 of bonds to secure $100 of loan; that no proper occasion existed for borrowing money for the Kentucky company, and that the execution and pledging of the bonds was part of the general

35

scheme for a diversion of the assets of the Kentucky company, and the purpose of executing this deed and making these loans was to bring about the foreclosure of the mortgage on a comparatively small loan, so that the interests of complainants and other stockholders of the Kentucky company might be cut off. The answer claims that this mortgage or trust deed did not cover the whiskey, book accounts and personal property of the Kentucky company—worth many millions of dollars; that the mortgage was duly authorized by two-thirds of each class of stockholders, as required by the articles of association, and that, with the exception of $1,500,000, all the bonds were, at the time of the answer, still in the possession of the Kentucky company; that the bonds and deed were authorized to provide additional working capital, which was necessary; that the bonds could not be sold at a satisfactory price, and therefore part of the bonds were used as collateral security for loans, not over $1,500,000 being deposited at any time, and that amount is held as collateral security for a loan of $500,000, made February 16th, 1900, to run for two years, payable by the Kentucky company at any time on thirty days' notice. It appears by the proofs that this loan of $500,000 has since been paid off, and that the $1,500,000 bonds were returned to the Kentucky company. Subsequently, and on the recommendation of a committee of the stockholders of the distilling company, called the protective committee, a plan for securing necessary working capital for all the constituent companies was recommended and carried out, under which the distilling company issued its own collateral trust bonds for $5,000,000, and has disposed of something over $4,000,000 at eighty cents on the dollar. The proceeds of the sale of these bonds have been turned over to the distilling company, which has loaned to the Kentucky company for working capital over $3,500,000, which is still unpaid. The $5,000,000 bonds of the Kentucky company constitute a portion of the collateral for the collateral trust bonds of the distilling company. The collateral trust agreement or mortgage, however, provides that, when the Kentucky company pays off what it owes to the Distilling Company of America, these $5,000,000 Kentucky bonds are to be returned to the Kentucky company. As the $5,000,000 Kentucky company bonds

were originally deposited with the distilling company to secure money due and to become due to it from the Kentucky company, this company would seem to be fully protected against the diversion of any of its assets covered by the mortgage to pay any other loans or indebtedness than its own indebtedness to the distilling company for money borrowed and used for its own purposes. The questions to be considered at the hearing as arising out of this transaction were therefore reduced to two. The *first* is whether the loan from the distilling company to the Kentucky company was within the proper exercise of the judgment and discretion of the directors of the Kentucky company acting for the interest of the company and all its stockholders, or whether it was an abuse of their authority and control exercised for the benefit of the distilling company only. The proofs fail to establish any case of the abuse or fraudulent exercise of the directors' powers in the management of the company in making this loan, or to show any reason for interference by this court with their judgment, which appears to have been made with entire good faith. The *second* objection to this loan is one made by the amended bill, after the facts relating to the mortgages and loan had been developed. This is that, in addition to six per cent. interest on its loan to the Kentucky company, the distilling company has charged to the Kentucky company the sum of $217,591.35 for expenses on procuring the loan, and that the Kentucky company is still liable to pay a further large amount, between $400,000 and $500,000. This item of $217,591.35, as appears by the answer and the evidence, is the proportion of the entire expense of obtaining the loan on the distilling company collateral trust company bonds (about $292,000), which is chargeable to the Kentucky company on the basis or proportion of the amount of the proceeds received by the Kentucky company. The latter company has not as yet paid to the distilling company any portion of this amount of $217,500. The $4,000,000 bonds issued by the distilling company were sold at eighty per cent.; were payable in ten years; $500,000 are redeemable each year, and, by the arrangement or accounts of the loan kept between the companies, the Kentucky company is to be charged with its proportion of the price paid, over eighty per cent., for redeeming the bonds, and to

be credited with the proportion of the price paid under eighty per cent. for the redemption. Up to the time of the hearing none had been redeemed under eighty per cent., and the additional sum of $15,000 had been charged as the Kentucky company's share of the expense of redeeming the bonds payable during the first year. It is claimed that these charges against the Kentucky company are usurious, inequitable and unfair.

The objection as to the equity of the charge appears to be unfounded, and I can see no equitable reason, under the circumstances disclosed by the evidence, why the Kentucky company should not pay its proportion of the expenses incident to loans made for its benefit as well as that of the other companies, and which it has secured and used for its own purposes.

It must be borne in mind that since the act of April 3d, 1902 (*P. L. of 1902 p. 459*), corporations can no longer set up the plea of usury on any obligations executed by them, even if this transaction between the companies comes within the scope of the Usury acts. But these questions as to the liability of the Kentucky company for interest alleged to be usurious, or for charges for expenses claimed to be inequitable, are plainly premature. None of these charges or expenses has been in fact paid, and the Kentucky company has not yet paid or offered to pay its loan of $3,500,000, the money actually received, with legal interest, all of which is undoubtedly due, and until it does so, all questions as to the legality of charging additional expenses or additional interest before returning the bonds or other evidences of debt to the Kentucky company are premature. When the Kentucky company has in fact paid, or offers to pay, the admitted debt, with legal interest, the question whether any additional payments or charges can be enforced against it by the distilling company, or, if actually made by the Kentucky company, should be returned to it, may perhaps be brought in question, in appropriate proceedings brought to test the question, but until payment of the admitted debt is made or tendered, decision upon the question is premature and therefore unnecessary.

By the amended bill two other classes of diversion of assets of the Kentucky company are alleged. One is that in 1899, and shortly after the organization of the Kentucky company, this

company paid over to the American Spirits Manufacturing Company more than a million dollars in money or in the capital stock of the Kentucky company; that this was done in anticipation of the organization of the distilling company, which organization was then contemplated by the persons now controlling the three corporations, in order that the distilling company, as the owner of the large majority of the stock of the spirits manufacturing company, might secure the benefit of this misappropriation of the assets of the Kentucky company. These allegations of misappropriation or diversion are denied in the answer which sets out at length the particulars of the transaction, which are, in my judgment, sustained by the proofs. The payments which are complained of—$400,000 in cash and $700,000 in stock of the Kentucky company—which were paid for two of the distilling properties which the Kentucky company was formed to purchase, were portions of the entire payment agreed to be made by the Kentucky company (about $29,000,000 in stock or cash) to one Stoll, who had options or controlled the properties (over fifty in number) as the vendor for the entire properties, to be conveyed according to the prospectus and under-writing agreement to which complainants were parties. As against the purchaser (the Kentucky company), Stoll, as the vendor, retained under the arrangement the right to apportion or divide the consideration among the different grantors, and it was under this reservation to Stoll, the vendor, that the spirits manufacturing company, the owner of two of the fifty or more properties conveyed, received the payments now questioned on making the conveyance to the Kentucky company. To require now the spirits manufacturing company or its directors to account for or repay this portion of the entire consideration to the Kentucky company, which has received the properties and retains them, would be in effect to make a new bargain for the purchase and in the absence of Stoll. This suit is not appropriate for the trial of a question of this character, and the charge that the alleged diversion was the result of any fraud or breach of trust on the part of the directors of the Kentucky company, for the benefit of the distilling company or its directors, is not sustained by the proofs.

The remaining question, as to diversion of assets of the Kentucky company, charged by the amended bill, arises out of the following facts, appearing by the answer and proofs:

The Kentucky company has organized, under the laws of West Virginia, two subsidiary companies, for the purpose of selling and distributing some of the whiskies which it manufactures to retailers. It conveyed to each of these companies a portion of its stock of whiskey; to one company, whiskey valued at $75,000; to the other, an amount valued at $900,000, for which it has received full-paid capital stock of the respective companies to these amounts. These sums are the entire capital stock of the companies, and this stock in both companies is owned by the Kentucky company and is controlled by it through its nominees, who are employes subject to removal. The company with the capital of $75,000, called the "Y" company in the proofs, was formed for the purpose of selling to the retail trade direct a particular brand of whiskey manufactured by the Kentucky company, and according to the evidence of Mr. Bradley, the president of the company, it has been successful and profitable—the Kentucky company selling to the "Y" company its whiskies at a profit, and in turn making a reasonable profit upon the capital of the "Y" company. With the "Z" company, capitalized at $900,000, business of the same character is transacted, but on a larger scale, and at present it supplies the largest outlet for the product of the Kentucky company, distributing about fifty thousand barrels a year, upon which both the manufacturers' and retailers' profits are made. The Kentucky company is also the owner of another distributing company, which was previously organized, called the "W" company, the stock of which it purchased and controlled. The "W" company distributes for the Kentucky company annually between twenty thousand and thirty thousand barrels, about one-seventh of its entire product, and is doing now a business of about $100,000 monthly. The business and property of the "W" company, including its good will, were purchased for about $150,000. As appears by its certificate of incorporation, the Kentucky company was formed for the manufacture, sale and dealing in whiskies, and also for the purpose of carrying on any part of its business, to invest in all kinds of property,

real or personal, within or without the State of New Jersey, including the shares of stock of other corporations. The right of the Kentucky company, under the charter and under the laws of the state, to purchase the stock of the pre-existing company, the "W" company, for the purpose of its business, was not contested at the hearing. It cannot be questioned, I think, that the method of distribution of its products by the machinery of subsidiary companies, considered merely as a matter of business management, is one with which this court will not interfere, nor will it attempt to control the business judgment of the directors, which appears to have been honestly exercised. The only question is that of power of the Kentucky company to invest its capital and organize such companies for this purpose. The doctrine of *ultra vires,* where it concerns purely a matter of business management of the corporate property by the directors or by the company, and where the power is called in question by a stockholder, must be applied reasonably and not unreasonably. The rule applied in these cases is the one announced by Lord Selbourne in the house of lords in *Attorney-General* v. *Great Eastern Railway Co., 6 App. Cas. 572, 49 L. J. (N. S.) Eq. 545, 547 (1880),* and approved by Vice-Chancellor Green in *Ellerman* v. *Chicago Junction Railroad Co., 4 Dick. Ch. Rep. 217.* This rule is, that whatever may be fairly and reasonably regarded as incidental to, or consequential upon, those things which the legislature has authorized, ought not (unless expressly prohibited) to be held by judicial construction to be *ultra vires.*

The legislature has here expressly authorized the manufacture and sale of a product, and this sale may undoubtedly be either at wholesale or retail; it has also (by the certificate) authorized the purchase of stocks of other corporations for the purpose of this business of selling, and by the express provisions of the Corporation act (section 51) has also authorized the purchase of the stock of corporations of other states. Considering this fifty-first section of the statute to be subject to the implied limitation that the purchase and ownership must be for the purposes of the business, this condition is complied with in the present instance, for the purchase and ownership is exclusively for the promotion

of the business of the sale or distribution of the product manufactured by the company.

The ownership of stock of other corporations for the purpose of the corporate business is the substantial thing authorized in these provisions, and, in the case of a private business corporation, exercising no public franchise of any kind, the method of acquiring such ownership of stock is incidental only. The second section of the Corporation act of 1896 expressly authorizes corporations to exercise all the powers contained in the act, so far as the same are necessary or convenient to the attainment of the objects set forth in the charter or certificate. Under this provision no question is or can be raised as to the power of purchasing stocks of existing companies for the purpose of accomplishing the distribution of the product, and, in my judgment, the organization of subsidiary companies for the same purpose and with the same object may be fairly and reasonably regarded as incidental to, or consequential upon, the business which is expressly authorized and convenient for the attainment of its objects, and should not, by a judicial construction, be held to be *ultra vires*.

As to companies in which New Jersey companies may hold stock and the states in which subsidiary companies may be organized, it may be that the late decision of the court of errors and appeals, in *Coler* v. *Tacoma Railway Co.* (*March, 1903*), limits the power of New Jersey companies to hold stock of corporations of other states to the stock in companies organized in states whose laws authorize their own domestic corporations to hold stock in and control their own domestic companies. In the *Coler Case* the court of errors and appeals, on the application of the stockholder of a New Jersey company, which owned a railroad in the State of Washington, enjoined the sale of the railroad to a Washington company, in consideration of stock of the Washington company, one ground being that, under the statutes of Washington and the decisions of the Washington courts, a Washington corporation had no power to purchase or hold the stock of a Washington company, and that it must therefore be concluded by the courts of this state that the ownership of the stock of a

Washington corporation by a foreign corporation was against the public policy of Washington, and this holding and control being thus against the public policy of the State of Washington, it should be enjoined in New Jersey.

In the present case there is no proof as to the statutes or decisions of the State of West Virginia upon the question of the right of a West Virginia corporation or of a foreign corporation to hold stock in a West Virginia corporation, and it must, in the absence of such proof, be assumed, under the laws of evidence as well as of comity, that the laws of West Virginia are similar to our own laws, and authorize the Kentucky company, formed under our laws, to exercise within the limits of West Virginia the powers conferred upon it under our statutes and its charter. The law of comity, settled in American jurisprudence by the decisions to which I referred at some length in my opinion in *Coler* v. *Tacoma Railway Co., 19 Dick. Ch. Rep. 117,* is that a corporation of one state of the Union may exercise within another state all the powers of its charter to the extent that its exercise thereof has not been prohibited in such other state or affirmatively declared by the constitution, statutes or decisions of such other state to violate its own public policy. Such violation of the declared public policy of a foreign state must be proved and cannot be assumed.

The questions above considered are all of the claims for relief raised by the bill or amended bill, which were relied on at the argument, or briefs on final hearing, and the only remaining question is the application of complainants to amend the bill. This application, which was made after the closing of the proofs and at the time fixed for argument of the cause, is resisted. No application is made to open the proofs, and the general rule applicable to amendments applied for under such circumstances is that amendments may then be made, if necessary and proper, in order that issues which have been, in fact, tried by the parties, and upon which both parties have been practically and fully heard, may be formally set out in the pleadings, so that the pleadings may conform to the proofs. *Story Eq. Pl.* § *905;* cases cited in *Ogden* v. *Thornton, 3 Stew. Eq. 569, 573, &c.* But

complainants cannot amend at the hearing in order to present a new or inconsistent case. *Pasman* v. *Montague, 3 Stew. Eq. 385, 393 (Chancellor Runyon, 1879)* ; *1 Dan. Ch. Pr. (6th. Am. ed.) 418, note "a."* The amendment sought is to add a claim that complainants, as the preferred stockholders of the Kentucky company, under the certificate of incorporation, are entitled to receive a stated dividend, payable quarterly, from the net profits arising from the business of the company; that net profits applicable to such dividends have been accumulated, but have not been paid. A prayer is added that such dividends may be directed to be declared and paid by the Kentucky company to the complainants. It is manifest that this cause of action concerns the Kentucky company and its directors alone, and that the parties to this suit, other than the Kentucky company and its directors, have no interest in this litigation. This amendment would make the bill multifarious. This claim also is for the specific performance of the contract to pay dividends, based on the valid continuous existence and management of the Kentucky company as a going corporation. It is therefore inconsistent with the case and claim for relief set up in the bill, which are based upon the supposed illegality of the management of the company, and pray for its dissolution and winding up by this court, and for the repayment to complainants of the amounts paid for their stock. It is also a claim as to which no notice was given in the issues made up on the pleadings, and to which no evidence has been specially directed, and upon which the Kentucky company and its directors have not been heard. The application to amend is denied, and the bills must be dismissed.