By the Court. Dues, J.
We listened to the defence in this ease, with great reluctance, and with serious doubts, whether without hearing the evidence, or the arguments of counsel, it was not our plain duty to reject and overrule it. This course, however, judges, who are conscious of their own liability to error, and aware of the hazard of trusting to first impressions, will rarely deem it expedient to follow, yet, in the present case, it might have been safely followed: our first impressions, so far from having been weakened, have been strengthened and confirmed by subsequent reflection. The entire defence might justly have been overruled; it has not a semblance of equity, and we are now thoroughly convinced, just as little foundatión in law.
Hpon the 20th of September, 1838, Wm. P. Hallett transferred to the defendant, Watson E. Lawrence, 360 shares -of the capital stock of the Morth American Trust and Banicing Company ; and, in consideration of this transfer, Lawrence, on the same day, executed and delivered to the president of the *164 company Ms bond and mortgage for $36,000, the nominal amount, or par value of the shares. The object of the present suit is the foreclosure of this mortgage. Of its validity when given, if the company had then a legal existence, we entertain no doubt. There is not a shadow of illegality in the transaction upon which it was founded. Hallett, as an original associate, was bound to pay to the company, when required, the nominal amount, or par value, of the shares for which he had subscribed. The law must now be considered as settled, that the obligation of actual payment is created in all cases by a subscription to a capital stock, unless the terms of the subscription are such as plainly to exclude it.—(Stanton v. Wilson, 2 Hill 153; Cross v. Jackson, 5 Hill 478; Valk v. Crandall, 1 Sand. Ch. R. 180; Farmers’ and Mechanics’ Bank v. Jenks, 7 Metcalf 392; Herkimer Manufacturing Company v. Small, 21 Wend. 273; Hartford and New Haven Railroad Co. v. Kennedy, 12 Conn. R. 499.) And in a masterly opinion in which all the cases are reviewed, the late assistant vice-chancellor has very clearly ■shown, that the general rule applies with peculiar force to the associates of a banking company under the general law. (Sagory v. Dubois, 3 Sand. Ch. R. 466.) When the company permitted Hallett to transfer his shares, they released him from Ms personal liability, and accepted the bond and mortgage of Lawrence in satisfaction of his debt. The transaction, in the technical language of the civil law, was a novation—the substitution of one debtor for another; and, in all such cases, the original debt is just as valid a consideration for the new promise or security as for that for which it is substituted. The transaction was just as lawful as if Hallett had secured the payment of the shares by his own bond and mortgage instead of those of a stranger. The adequacy of the security is the only question that the company had to consider, its validity being just as unquestionable in the one case as the other.
It is evident that Lawrence, in purchasing these shares, had no intention to become a permanent stockholder in the company ; his object was, by the instrumentality of the shares, to raise the large sum of money which he seems to have required, and accordingly the shares were converted into cash with the *165 least possible delay. He transferred two hundred and seventy on the very day on which he received them, and the residue within a few weeks thereafter. We must presume that he transferred them for value, and that this value was the sum which they represented; in other words, that he sold the shares at par, and this reasonable, and in the absence of contrary proof, necessary presumption, was neither contradicted by evidence nor denied in argument; we, therefore, regard it as certain, that the transaction, in the result, was nearly, if not quite as beneficial to Lawrence as a direct loan from the company, of the whole amount for which his mortgage was given. At any rate, the debt which the mortgage purports to secure, was equally just, and the obligation to pay it quite as binding in law and in conscience.
Upon what ground, then, is the payment of this debt resisted? Has Lawrence, in the event, sustained any injury or loss ? Upon the ground that the shares which he sold had no legal existence or value, as is now alleged, has he been forced to take them back, and refund the whole, or any part, of the moneys which he received ? Hothing of this kind is pretended. Has the mortgage, then, been satisfied, in whole or in part, by him or those claiming under him? Ho, not a dollar of the principal has been paid; nor, for the last seven or eight years, a dollar of the interest: yet during this whole period, until, at the close of the last term, we appointed a receiver, he, and those claiming under him, have been allowed to retain the possession and receive the rents of the mortgaged property. Has Lawrence, then, or any of the other defendants, any claims or demands against the company which form, or are supposed to form, a legal or equitable set-off? Hone whatever. Hence every defence, except upon grounds purely technical, seems to be excluded.
It might, however, have been supposed, from the language in which the defence was opened, that, instead of being strictly and purely technical, it was highly meritorious. A stupendous fraud upon the public and upon individuals, it was said, had been perpetrated, which the defendants, through their counsel, were bound to expose. The Horth American Trust and Banking *166 Company, we were told, was conceived in sin, and brought forth in iniquity, and throughout, in its origin, progress, and result, was an enormous scheme of peculation, robbery, and plunder. We were not told, however, how these facts, if true, had any bearing upon the case of the defendants; how, if true, they could furnish to them any excuse for seeking to repudiate a just debt, or any reason, or even pretext to us for exonerating them, or the mortgaged property, from its payment. If any fraud was meditated by the- founders of this association, it was a fraud of which those who might intrust or advance their funds to the company, in good faith, its innocent stockholders and creditors, were meant to be the victims; and it is exactly to this fraud that the defendants, in resisting the payment of the mortgage, render themselves parties; and it is exactly this fraud that we are requested to sanction by a decree in their favor. In requiring us to declare that this mortgage is a worthless and void security, we are, in effect, required to declare that this is equally true in respect to all the securities now in the hands of the receivers of the company. We are required to declare that all its assets, now in their hands, are waste paper, and that no portion of them, no matter how obtained, or upon what consideration founded, is applicable to the payment of its debts. It is possible that it may be our duty as judges to make this declaration; but assuredly the reasons that can alone justify us in thinking or saying so, must not merely be cogent, but irresistible. Nothing but the pressure of a legal necessity, from which there is no possible escape, will induce us to say, that the two or three millions of debts which are owing to this company, are not to be applied to the payment of the still larger amount of debts which it owes. An enormous fraud will indeed have been committed, if the debtors are all to be released and the creditors to remain unpaid: but it must be remembered, that this fraud is only to be consummated by the action of the debtors themselves, and that if con- ' summated, it is to them that the guilt will attach, and upon them that its reproach must fall; a truth that in the vehement denunciation to which we listened seems to have been forgotten.
Still the grounds upon which a decree for the sale of the mortgaged premises is opposed, may be such as to leave us no *167 alternative, but to declare the invalidity of the mortgage, without any regal'd to the consequences to which our decision may lead. The objections, therefore, that have been relied on, must be stated and examined. Omitting those that were overruled upon the hearing, such as the unconstitutionality of the General Banking Law, and some that we consider to have been virtually abandoned, we confine ourselves to the positions upon which the leading counsel for the defendants ultimately placed the defence, and to the support of which his arguments were principally directed. They are the following:—
1. That it appears from the evidence that the capital mentioned in the certificate of the associates was not actually paid before the making and filing of their certificate; and that by the just construction of the General Banking Law, this antecedent payment of its capital was a condition precedent to the legal existence of the association; otherwise it could not become a corporation, or quasi corporation, under the law, nor possess any of the rights or privileges that the statute confers. Hence, as the shares of stock transferred to the defendant, Lawrence, had no legal existence or value, there was an entire failure of the consideration upon which his mortgage was founded; and hence also the plaintiff has no locus stcmdi m judicio, his capacity to sue being no greater than that of the pretended association which he represents.
2. Admitting that, when an association is formed, a subscription for its capital, instead of its actual payment, may justify its organization; in this ease there was no valid subscription. The actual subscription was nominal and fictitious, it being understood and agreed between the associates that no one of them should be bound to take any more of the shares for which he subscribed, than he might find it convenient to pay for, or secme to be paid; in other words, it being agreed between them that the subscription should create no obligation of payment. Hence, that the defendant, who purchased his shares in good faith, in the belief that the entire capital had been paid in, or secured to be paid, was deceived and defrauded.
We shall hereafter examine these positions and state the rear sons that compel us to reject them; but there are various grounds *168 upon which we might justly refuse to consider them at all, and to these we shall, in the first instance, briefly advert.
First. No such defence as these positions are supposed to involve, is set up in the answer. It is true, the answer alleges, that’ the company was never lawfully incorporated or organized raider the statute; hut the grounds upon which this allegation is rested, are widely different from those to which the evidence upon the hearing, and the arguments of counsel, were alone directed. The answer contains not a sentence or word, from which it can he inferred, that the necessity of the payment of the capital before the making and filing of the certificate of the associates, and the want of such payment, were meant to he relied on as a defence. On the contrary, the allegations of fraud, which the answer charges upon the associates, are, that instead of paying into the funds of the company, or securing to he paid, the amount of their subscriptions, as they were hound to do, they substituted bonds and mortgages, and other securities of little or no value, evading and defeating by these means the intent and object of the law. The answer, therefore, plainly admits, that a subscription to the capital stock of a hanking association creates an obligation to pay the amount of the subscription to the company, when organized, and that the comjiany, instead of demanding a payment in cash, may take adequate security for future payment: admissions directly inconsistent with the construction of the statute which we have been urged to adopt. As to the alleged agreement of the associates, that their subscription should impose upon them no personal liability, we have been unable to discover, in the answer, any averment, or even intimation of its existence.
Second. We are satisfied that the defendant, Lawrence, and those claiming under him, are estopped from denying the corporate existence of the company, with which he contracted; or, more properly, are concluded by the evidence of the fact which has been given. The certificate made and filed by the associates, was in exact conformity to the terms of the statute. It contained all the particulars that the law requires to he inserted; it was duly acknowledged and recorded in the county clerk’s office, and a copy duly filed in the office of the secretary of state, and *169 the seventeenth section of the act declares that every such certificate, or copy, properly certified, may he used as evidence for and against the company in all courts and places whatever. Evidence of what ? Plainly, evidence of the truth of the facts that it recites; evidence, therefore, that the provisions of the act had been complied with, and that the company was duly organized. The eighteenth section enumerates and defines the powers, that every “ such association shall possess,” and the words, “ such association,” we can only understand as referring to every association of which a certificate, corresponding with the terms of the law, has been duly recorded and filed. Hence, from the time these acts are performed, the association becomes a corporation, or quasi corporation, under the statute, possessing all the privileges, and competent to exercise all the powers that the statute confers; and from that time every individual is precluded from denying its legal or corporate existence in any suit or controversy whatever. If there were any illegality or fraud in its organization—if, from inadvertence or design, any of the material facts set forth in the certificate were untrue—the association may undoubtedly be dissolved by the action of the sovereign power of the state; but as between the company and individuals, no evidence of such illegality or fraud can be given, in order to invalidate its certificate and disprove its legal existence or title ; no individual who had dealt with the company is permitted to say that it had no authority to contract and no capacity to sue.
We deem it unnecessary to go into an examination of the numerous authorities that were cited by the plaintiff’s counsel, as applicable to these positions, but shall content ourselves with referring to a single case that binds us by its authority, and in its material circumstances is not distinguishable from the present. It is that of the Triton Insurance Company v. McFarlan (4 Denio, 392), which was first decided in this court, and removed by a writ of error to the supreme court, where the judgment of this court in favor of the plaintiff was affirmed. The suit was upon a bond given by the defendant to the company, to secure the payment of certain shares of stock, and his sole defence was a denial of the corporate existence of the company. The company was not made a corporation by the mere *170 passage of the law under which it was organized, hut the act only incorporated those who should thereafter become stockholders, within a certain time, and upon certain conditions, and among these conditions was that of the payment of a certain sum upon each share, as subscribed. The act contained a further provision, that the company should not commence business until a deposition had been made by the president and secretary, that the capital had been paid or' secured to be paid; and the evidence was, that this affidavit had been made and filed, and that from that time the company commenced its business, and had been in the constant exercise of its corporate powers. The defendant, in opposition to this evidence, had offered to prove that the sum required to be paid upon each share, at the time of subscription, had not in fact been paid, and insisted that this payment was a condition precedent, the breach of which rendered the charter a nullity.
The judges of the supreme court, however, were of a different opinion, and regarded the proof offered by the defendant as wholly inadmissible. They held that the state alone had the right to inquire into any sins that might have been committed in bringing the corporate body into existence, but that its corporate existence, so far as third persons were concerned, was conclusively shown by the making and filing of the affidavit, and the subsequent user of its corporate powers. It is manifest that the making and filing of the certificate under the general banking law, were meant and must be construed to have the same effect, as the making and filing of the affidavit under the special act of incorporation to which this case refers, and hence no rational distinction can be stated, to exempt us from the controlling authority of the decision.
The general rule, which is fairly deducible from all the cases on this subject, was stated and acted upon by this court, in Brouwer v. Appleby (1 Sand. Sup. C. R. 108.) It is, that a defendant who has contracted with a corporation de facto, is never permitted to allege any defect in its organization, as affecting its capacity to contract or sue; but that all such objections, if valid, are only available on behalf of the sovereign power of the state. As every association under the general *171 banking law' is a corporation’ or a quasi corporation, de facto, from the time that the certificate of the associates, if corresponding with the terms of the law, is recorded and filed, the application of the rule to the present case is seen, at once, to be decisive.
There is still another ground upon which the defence, without inquiry into the truth of the positions upon which it is founded, might be justly overruled. The entire argument of the defendant’s counsel proceeded on a very erroneous view of the nature of the transaction between Lawrence and the company. It was assumed that the transfer of the shares was the consideration of the mortgage, and that it was from the company that Lawrence’s title to the shares was alone derived; but such assuredly was not the fact. Hallett was the owner of the shares, and it was from him alone that the title of Lawrence was, or could have been, derived. The transfer of the shares was the price paid by Hallett to Lawrence, for assuming his debt to the company; but the debt thus assumed, as between the company and Lawrence, was the true and sole consideration of the mortgage, as certainly as if it had been executed by Hallett himself. Hence the mortgage is only to be impeached by showing the insufficiency or illegality of this consideration; that is, by disproving the existence of the debt. But it is exceedingly clear, that Hallett could never have denied the existence of the debt, nor resisted its payment. He was an original associate, and could never have been permitted to impeach the certificate which he had subscribed; he could not, therefore, have denied the legal existence of the company, or the validity of its shares. If there was any fraud or illegality in the organization of the company, it was a fraud or illegality to which he was a party, and upon which he never would have been allowed to found a defence. Lawrence, by assuming his debt, placed himself in the same relation to the company, and was estopped from disputing the validity of the debt upon any grounds that could not have been taken by Hallett himself. It has been decided that a guarantor is not permitted to dispute the existence or the amount of the debt that he guarantees, where these have been conclusively admitted by the debtor, (Mann v. Eckford’s Exec., *172 15 Wend. 502,) and the principle of the decision, it is evident, applies as well to a person who assumes absolutely the debt of another, as to him who engages collaterally for its payment.
We proceed now to the direct consideration of the objections that are relied on; not that it is at all necessary that these objections should be answered, in order to justify the decision that we propose to make, but that the same, or similar objections, may not be raised in any future case that we may be required to determine. The construction of the general banking law, upon which the first objection proceeds, namely, that the actual payment of the capital must precede the making and filing of the certificate, we have no difficulty in rejecting. It is as unreasonable as it is novel. It is not required by the terms of the statute, and is inconsistent with several of its provisions. The third subdivision of the fifteenth section declares, that the certificate of the associates “ shall specify the amount of the capital stock of such association;” and it is upon these few words—this narrow foundation—that the ingenious argument of the defendant’s counsel was exclusively built; yet these words are so far from necessarily implying that the capital has been paid when the certificate is made, that it is only by a strained and violent interpretation that such a meaning can be attributed to them. The terms “such association” are used throughout the law, as designating, not the individuals who agree to form the association, but the association itself when formed; an association clothed with all the powers and attributes that the statute confers; and we, therefore, cannot understand how such an association can have a capital before it exists. If the payment of its capital is to precede its existence, when, how, and to whom is it to be paid ? From whom is the authority to receive it to be derived? Whose property is it until the association is organized ? How is it to be seemed in this interval ? When, how, and to whom is it to be paid over? Hot one of these questions is answered by the law as it stands, but we find it impossible to believe that any one of them would have been left unanswered, had the legislature intended that the payment of the entire capital should be a condition precedent to the existence of the association. We find it impossible to *173 believe that such an intention, instead of being plainly and fully expressed, would have been left to be gathered, by a remote and doubtful implication. There are numerous acts of incorporation, many of which were quoted by the defendant’s counsel, as showing the general policy of the state, in which the payment of a portion of the capital is made a condition precedent to the existence of the corporation; but, in every one of these acts, the persons to whom the payment is to be made are named or designated, and the time and mode of payment, and the disposition to be made of the moneys paid, are carefully prescribed; nor can we doubt that specific regulations of such manifest propriety would have been found in the general banking law, had the legislature meant that the payment of the whole, or of any portion of the capital of an association, should precede its organization. We have said that the interpretation we reject is inconsistent with several provisions in the law; and it plainly is so. It is inconsistent with the provision in section 19th, that every person to whom shares of stock are transferred, shall succeed to the rights and liabilities of the original stockholder. It would be absurd to suppose that any liabilities are here meant, except such as directly relate to the shares themselves ; and if the shares have already been fully paid for, none such can exist. It is inconsistent with the provision in section 26th, that the semi-annual statement to be made to the comptroller shall “ specify the amount of the capital paid in, or seow'ed io l>e paid for if the whole capital has been paid, no portion can remain for which security is to be given. If the whole capital has been paid, and then loaned by the company, each loan is an investment of cajfital paid, not a security for its future payment ; and every such investment would appear, in the statement to the comptroller, among the debts due to the association, not as a part of its unpaid capital. We do not doubt that the whole capital of an association must be paid, or secured to be paid, when it is organized ; but it is secured to be paid, in the sense of the law, by force of the subscriptions of the associates, just as certainly as if each associate had given his note or bond for the amount of his shares. The security may not be adequate, but it exists; and of its adequacy the public has been wisely left to *174 judge. This construction was given to the statute by the assistant vice-chancellor, in Sagory v. Dubois, and was the ground of his decision, that the defendant in that suit was liable to the receiver of the Hew York Banking Company, for the whole amount of the shares, for which, as an original associate, he had subscribed.
The second objection, that the associates had agreed not to be personally liable upon their subscriptions, is, if possible, still more untenable than that which we have considered. It admits of several distinct replies. First. The evidence, so far from proving the existence of such an agreement, leads, when fairly considered, to an opposite conclusion. Some of the associates, who were examined as witnesses, were assured that, should they be unable to pay for the shares which they subscribed, or secure their payment by their bonds and mortgages, other persons would, doubtless, be found, who would relieve them in whole, or in part, from their subscriptions; but not one of them was assured that, in no event, was he to be personally responsible; much less is there any proof that it was the understanding and agreement of all the associates that their subscriptions should only be binding at their election. Second. Had such an agreement been fully proved, it would not have affected the validity of the subscription, nor altered, in the slightest degree, the personal liability of any one of the associates. The agreement would have been void, but not the subscription. Hot one of the associates, had the payment of his shares been demanded by suit, could have set up such an agreement as a defence. And lastly: Had the agreement been proved, and had it rendered invalid the subscription, the defendant, Lawrence, would have no ground of complaint. If deceived, he has not been damnified. He has derived, from the transaction with the company, all the benefits that he anticipated. His condition is exactly the same as it would have been had the facts he supposed to exist been actually true. He bought the shares to sell them; he has sold them, and received the avails; and it would be in the highest degree inequitable and unjust to permit him to rescind a contract, the fruits of which he retains, and can never be compelled to restore. He cannot impeach a title that he has himself *175 transferred, until the invalidity of his own transfer has been established—a rule that, in our* judgment, is just as applicable to every transfer of personal property as of real estate; and upon this single observation, had it been necessary or expedient, we might have rested our decree.
Upon the whole, the defence that has been set up, is as unsubstantial and shadowy, as it is inconsistent with good faith; it is inadmissible in law and groundless in fact. Hence it is unnecessary to consider the other questions that were raised upon the argument, and which were only material as excluding" a defence that might otherwise have been valid. We strongly incline to thinh that the effect of the written consent given by Lawrence to the assignment of his bond and mortgage to the comptroller, was to create an estoppel, of which the subsequent assignees from the company, who are represented by the plaintiff, are entitled ■to avail themselves ; and it is also the inclination of our opinion, that the provision in the conveyance of the mortgaged premises to Effingham if. Lawrence, rendering it subject to the payment of the mortgaged debt, although it created no such privity as could render the grantee personally liable to the plaintiff, is yet to be regarded as an admission of the validity of the mortgage, as a subsisting incumbrance, by which all the defendants are concluded. These are questions, however, of great interest and wide extent, and they deserve to he carefully examined, upon principle, and upon the authorities, before they are decided. Hence we are not to be considered as now deciding them.
The plaintiff is entitled to a decree, with costs, for the amount of the principal and interest, proved to be due upon the mortgage : and also to a decree against Watson E. Lawrence for whatever deficiency may arise upon the sale.