EDWARD S. CAMPBELL, receiver, &c., of the Middlesex County Bank,

*v.*

THE PERTH AMBOY SHIPBUILDING AND ENGINEERING COMPANY, THE NAUTICAL PREPARATORY SCHOOL, SARAH J. L. RAMSAY, individually and as administratrix of Hugh Ramsay, deceased, OLIVER W. RAMSAY et ux. et al., heirs-at-law of Hugh Ramsay, deceased, et al.

[Decided November 3d, 1905.]

1. In a suit to foreclose certain mortgages given to a bank, evidence *held* insufficient to establish an agreement between the mortgagor and the bank that certain notes deposited as collateral for the secured debt should be taken by the bank and credited in payment thereof.

2. Where a bank, prior to its failure, had taken steps to extend its corporate existence under *1 Gen. Stat. p. 972 § 302*, authorizing the extension of the life of corporations, and had thereafter operated and been treated as a banking association legally organized, both by the public and the state government, a borrower was estopped, in an action by the bank's receiver to foreclose certain mortgages securing certain loans, to allege that at the time the loans were made the bank had no legal corporate existence.

3. Where certain mortgages given to a bank recited that the bank was about to loan certain sums of money to the mortgagor, in an amount not to exceed in the whole a specified sum, by discounting his notes payable in three months, such mortgages secured demand notes discounted by the bank for the mortgagor, which referred to the mortgage and were treated by both parties as secured thereby.

4. Parol evidence is admissible to show the real object of a mortgage, and that it was given for a purpose not disclosed in the condition.

5. Where an administratrix sold certain mortgaged premises to pay the mortgage debt, and the purchasers paid nothing to the administratrix, but bought for the benefit of a corporation formed by them to operate the property, the administratrix had a vendor's lien on the premises to the extent of the purchase price, to which the creditor for whose benefit the land was sold was entitled to be subrogated.   .

On final hearing on bill, answer and cross-bill and answers.

*Mr. Sherrerd Depue,* for the complainant.

*Mr. Alan H. Strong,* for the defendant Sarah J. Ramsay, individually and as administratrix, and for the Nautical Preparatory School and for George H. Newhall, its receiver.

*Mr. Adrian Lyon,* for the Perth Amboy Shipbuilding and Engineering Company and Willard P. Voorhees, its receiver.

*Mr. Abel I. Smith,* for the United States Wood Preserving Company.

*Mr. Joseph E. Stricker,* for Orin Hooper & Sons.

*Mr. Charles C. Hommann,* for the city of Perth Amboy and for the Perth Amboy Trust Company. ·

*Mr. George L. Record,* for Oliver W. Ramsay.

PITNEY, V. C.

This is a bill to foreclose three mortgages given by Hugh Ramsay, since deceased, and his wife, upon certain premises in the city of Perth Amboy, to the Middlesex County Bank, which, upon the insolvency of that institution, in 1899, came into the hands of the complainant, Edward S. Campbell, as its receiver.

Certain of the defendants, who have various and conflicting interests among themselves, the nature and character of which need not now be stated, join in disputing and defending the complainant's claim on three grounds.

*First.* That the whole transaction on which complainant's right rests is void and unenforceable because in violation of an act of the legislature with regard to the conduct of the business of banking.

*Second.* That the mortgages produced by the complainant do not, by their terms, cover and secure the indebtedness relied upon by the complainant. In other words, that nothing is due on them.

*Third.* That a large portion, quite one-half of the debt claimed, was paid by Hugh Ramsay in his lifetime, in the manner set out in the defendants' answers.

The most important of these defences is the last, viz., that relating to the amount of complainant's claim, and will be first considered.

I say "most important" because Ramsay died seized of the premises covered by the mortgages, besides other property, and almost his entire indebtedness was to the complainant, and his property was ample to pay all his debts, including the complainant's claim at its full amount.

Letters of administration on his estate were taken out by his widow.

The complainant prepared and verified and presented to the administratrix a sworn claim for the amount he claimed to be due.

The administratrix did not dispute it, but applied to the orphans court of Middlesex county for leave to sell the real estate covered by complainant's mortgages to pay that debt, and actually sold it to the defendant the Shipbuilding and Engineering Company for a sum of money sufficient to pay the claim, upon conditions and under circumstances which will be more minutely referred to later on.

Complainant's claim consists of the aggregate of nine several promissory notes, made by Hugh Ramsay to the bank, and upon which the undisputed evidence shows that the money was advanced to Ramsay at about their several dates, and upon which the interest was paid by Ramsay from time to time up to a short time before the failure of the bank and the appointment of the receiver, which occurred in July, 1899.

*4 Robbins.*    Campbell *v.* Perth Amboy Shipbuilding, &c., Co.

The several promissory notes are as follows, all payable on demand:

| | | |
|---|---:|---:|
| February 6th, 1892 | $1,500 | 00 |
| March 3d, 1892 | 10,000 | 00 |
| March 14th, 1892 | 3,500 | 00 |
| March 19th, 1892 | 2,000 | 00 |
| October 15th, 1892 | 2,500 | 00 |
| February 6th, 1893 | 3,000 | 00 |
| December 31st, 1894 | 4,000 | 00 |
| June 29th, 1895 | 3,500 | 00 |
| September 18th, 1895 | 19,600 | 00 |
| | $49,600 | 00 |

This last note is in form what is known as a stock collateral note, as follows:

"$19,600/00.

"PERTH AMBOY, N. J., Sept. 18, 1895.

"On demand after date I promise to pay to the order of Middlesex County Bank, Perth Amboy, N. J., nineteen thousand six hundred 00/— dollars at said bank, with interest, for value received, I having deposited herewith as collateral the undernamed securities, which I authorize the holder of this note, upon the non-payment hereof at maturity, to sell either at the brokers' board or at public or private sale without further notice and apply the proceeds, or as much thereof as may be necessary, to the payment of this note and all necessary expenses and charges, holding me responsible for any deficiency. Securities deposited herewith.

"Notes of the Mining, Dredging and Power Company for a like amount, due Sept. 1, 1896.

"Also included and secured in mortgage given by me to said bank.

"(Signed) HUGH RAMSAY."

The collaterals mentioned in this note were six debt certificates or promissory notes of various sums, aggregating $19,500, made by a corporation known as the Mining and Dredging Power Company, dated in August, 1895, and payable on the first day of September, 1896, with interest, being part of a series of $45,000 secured by a mortgage executed by the Mining and Dredging Company to the State Trust Company of the city of New York, which covered a steam floating dredge, which had been built by Mr. Ramsay, who was a shipbuilder.

These debt certificates, with one other for $5,000, had been taken by Mr. Ramsay as part payment for the balance due him for the dredge.

The other $5,000 note, at some time, was pledged by Mr. Ramsay to the law firm of Sullivan & Cromwell, as security for a less amount due them, either for professional services or money loaned.

The dredging company was a failure and passed into the hands of a receiver, and the dredge in question was subjected to maritime liens, and under them came into the hands of the United States marshal of New Jersey, and early in 1897 was brought to a sale under foreclosure of the mortgage. It was also sold by the receiver in insolvency and by the United States marshal for New Jersey in enforcement of the maritime liens.

The allegation of the several defendants in support of the claim of part payment is that some time prior to the month of April, 1897, a verbal contract was entered into between Hugh Ramsay and the bank, by which it was agreed that the six notes aggregating $19,600, held by the bank as collateral to Ramsay's note of that amount, together with the $5,000 note of the dredging company held by Sullivan & Cromwell, aggregating $24,600, should be taken and accepted by the bank as an absolute payment of $25,000 (being $400 more than the face value, without counting interest), on account of Ramsay's indebtedness to the bank.

The avowed object of this transaction was to enable the bank to purchase the dredge at public sale and use these notes in payment therefor, so far as the dividends declared thereon by the receiver would be sufficient therefor.

At the time of this alleged agreement the six dredging notes held by the bank had been sent to New York, where they were payable, for collection, and had presumably been presented to the receiver for the purpose of the dividend thereon.

This verbal contract is attempted to be proven by the evidence of Mr. Valentine, the cashier of the bank, and by Oliver W. Ramsay, the son and clerk of Hugh Ramsay.

It is alleged to have been made between Hugh Ramsay, on the one part, and U. B. Watson, president of the bank, and Valen-

tine, its cashier, on the other, at two or three interviews at the banking-house.

Watson denies the making of any such agreement. ·Each of the directors of the bank swears that he never heard of it.

The books of the bank show not the least trace of any such transaction. Neither the $19,600 note nor either of the smaller notes held by the bank were given up to Mr. Ramsay.

Interest on the whole $49,600 was charged to and paid by Ramsay on the first day of July, 1897, following the alleged contract, and again on the first day of January, 1898. After that date Valentine, without the knowledge or consent of the president, Watson, or of any director, reduced the interest charges against Ramsay by the amount accruing on $25,000.

Later on, and before the failure of the bank, Watson discovered that Ramsay was not paying interest on his whole indebtedness, and swears that he spoke to Ramsay about it, who answered that Valentine, who had become the owner of the dredge, had promised to pay one-half of the interest due by him to the bank. This answer by Hugh Ramsay to Watson is of great importance, as will appear further on.

The complainant, shortly after he was appointed receiver, finding among the valuable assets of the bank the nine notes of Ramsay above set forth, made up a statement of the amount due thereon and mailed it to Hugh Ramsay and urged payment, and had quite a voluminous correspondence with him about it, and one or more interviews with him, in which he urged payment of the whole or part of the indebtedness, and at no time did Ramsay dispute the amount due for principal, but did allege some errors in the amount of interest.

Ramsay died on the 15th day of April, 1900 (about nine months after the appointment of the receiver), intestate, and on the 4th of May following letters of administration were granted to his widow, the defendant Sarah J. L. Ramsay.

He left a family of eight children, one of whom is an infant.

The complainant made out a sworn claim against the estate, based on the nine promissory notes above mentioned, with interest thereon, amounting to $52,240.28, and duly served the same on the administratrix.

No objection has ever been made to that claim by her, nor has complainant been called upon, under the statute, to bring an action at law.

Four of the heirs-at-law were sons, most, if not all, of whom lived in Perth Amboy, near or with their mother.

All the proceedings by the administratrix in settling the estate were taken by and with the advice of her sons and her and their counsel, Judge Lyon.

They were all fully aware of the alleged contract by which a credit of $25,000 should be made on complainant's claim, but never made it known to the complainant—in fact, it was studiously concealed from him.

He was continually urging payment or arrangement of the claim and threatening foreclosure. The sons were as continually asking for time.

There seems to have been some undefined, supposed defect in the title to some part of the mortgaged premises, which they were taking measures to have removed or cured, and these measures were set up as a reason for delay in foreclosure.

The only debt of the estate besides the complainant's was a large arrearage of taxes due the city of Perth Amboy.

Some part of the premises were under a lease to the defendant the Wood Preserving Company, which was bringing in rents, which were applied, I believe, in the reduction of the taxes.

Finally, the adult sons whom I have mentioned, who, of course, with all the children, are parties defendant, conceived the idea of forming a corporation to conduct the business of shipbuilding on a part of the mortgaged premises, which were well adapted for that purpose and had been used for that purpose by Hugh Ramsay in his lifetime, and on the 12th of September, 1901, they incorporated a company by the name of the Standard Shipbuilding Company, which name afterwards, on February 24th, 1902, was changed to the Perth Amboy Engineering and Shipbuilding Company, one of the defendants herein.

On the 2d of March, 1901, Mrs. Ramsay presented to the orphans court of Middlesex county a petition praying for the aid of the court and for an order to sell lands.

The petition contains a list of all the real estate of which Ramsay died seized, including the mortgaged premises (the value of which latter is therein stated at $225,000), and is verified by her affidavit.

Annexed to it is a sworn statement of debts and personal assets, of the same date, the substance of which is as follows: The amount of the inventory, $25,359.18. The debts stated were taxes due, $7,982. Then follows "claim by Edward S. Campbell, receiver of Middlesex County Bank, with interest to March 1st, 1901, $54,560." Then follow several small items of money actually paid by the administratrix for expenses in care for the property.

On that petition the ordinary order to show cause was made on the 16th of April and duly published, and on the 18th of June a decree was made, which, after reciting that the order had been duly published, and that the court had determined, on full examination, that the personal estate was insufficient to pay the debts to the extent of $41,161.53, ordered that the administratrix should sell the whole of the lands of the decedent.

The report of assets and liabilities just mentioned shows conclusively that the deficiency of $41,161.53 found by the court could not have been arrived at without counting the complainant's claim at its full face.

On the 25th of November, 1901, Mrs. Ramsay made a report to the court, under oath, that she had sold, at private sale, to the Standard Shipbuilding Company, the part of the mortgaged premises used for a shipbuilding plant, for the sum of $52,410.28 (which is the amount of the complainant's sworn claim against the estate),

"upon the condition that the Standard Shipbuilding Company will assume and pay a mortgage held by Edward S. Campbell, receiver of the Middlesex County Bank, upon the said above-described property, being all the land described as tract number one in said petition, upon which mortgage, with interest, there is claimed to be due by said receiver the sum of $52,410.28, which assumption and payment of said mortgage shall be considered as the payment of the consideration money for the said tract so sold as aforesaid to the Standard Shipbuilding Company."

On that report the court, on the 29th of November, made an order confirming the sale, inserting in the order that part of the petition above quoted, and directed a deed to be made.

The administratrix made her deed, dated the 27th of November, 1901, to the Standard Shipbuilding Company, for that portion of the mortgaged premises, in consideration of $52,-410.28, which contained a clause of assumption precisely the same as that above quoted.

That deed was recorded on the same day, viz., November 29th, 1901, in the Middlesex county clerk's office.

In February, 1902, the name of the Standard Shipbuilding Company was changed to the Perth Amboy Engineering and Shipbuilding Company, and on the 25th of February the administratrix made a deed to the Perth Amboy Engineering and Shipbuilding Company for all of the mortgaged premises except the shipyard plant, previously conveyed, the consideration named being $75,000, which deed purported to be based on the same order of the orphans court made on the 18th of June, 1901.

That deed was duly recorded on the 18th of March, in the Middlesex county clerk's office. It is here to be observed that the previous sale of November 27th more than paid all the deficiency shown by the statement of debts and credits contained in the administratrix's application to the orphans court, so that there was no occasion for this conveyance. Moreover, the administratrix valued the mortgaged premises, as we have seen, at $225,000, and yet she induced the orphans court to approve these two conveyances, which aggregated nearly $100,000 less than she valued the premises. The fact is that these conveyances were a part of a family arrangement, and the whole object of the proceedings was to cut off the title of one of the heirs who was under age.

On the 14th of March, 1902, the administratrix executed another deed to the Perth Amboy Engineering and Shipbuilding Company, based on the same order of June 18th, in consideration of $52,410.28, for the same portion of the mortgaged premises conveyed by the deed of November 27th, 1901, and that deed (as well as the other two deeds) contained an acknowledgment of the payment of the consideration money, and after the description contains this clause: "This conveyance is made subject to a mortgage held by Edward S. Campbell, receiver of the

Middlesex County Bank, upon the above-described property, together with other tracts."

In point of fact, not a dollar of cash was paid for any of these conveyances to the administratrix.

Shares of stock in the corporation were allotted to each of the heirs and to the widow, according to their several interests. No other stock was at any time issued to any other person.

It is proper here to state that the reason given by the defendants at the hearing why the deed of November 27th, 1901, was, so to speak, abandoned and ignored, was that a New York counsellor, who was advising the parties, objected to it. As no stock was issued outside of the family, and as the parties interested were attempting to float an issue of bonds, I can imagine that counsel who was consulted with regard to that issue may have raised some question as to whether the title, which was made to the original Standard Shipbuilding Company, would be vested in the same company after its name was changed to the Perth Amboy Engineering and Shipbuilding Company. I said that no stock was issued outside of the Ramsay family. There may have been some shares transferred to other persons for corporate purposes.

There were, besides the mortgaged premises, quite a number of building lots, some of which were sold by virtue of the same order.

After the title was vested in the shipbuilding company, negotiations took place between the directors, who were the sons of the mortgagor, and the complainant, with a view to the issue of corporate bonds on the mortgaged premises and the satisfaction of the complainant's mortgage by a portion of these bonds, but the complainant naturally declined and insisted upon the payment of his money, with the result that this bill was filed November 30th, 1903.

In answer thereto, this alleged payment was for the first time set up.

Now, without asserting that the failure by Hugh Ramsay and his sons for so long a time to set up the defence in question, the tacit acknowledgment from time to time of the justice

of the complainant's claim, the treating it as valid for its full amount in the proceedings in the orphans court, the insertion of its assumption at its full face in the first conveyance, work an estoppel against these defendants, especially the infant, yet the circumstances stated do amount to an explicit admission on the part of the adult defendants, all of whom were thoroughly familiar with the facts and circumstances, that the whole amount of the complainant's claim was due.

But let us return to the month of April, 1897, and trace the history of the transaction in connection with the dredge from that time.

It is quite clear, from the evidence of Oliver Ramsay (who is the only reliable witness on defendants' part to this contract), as well as that of Valentine, that nobody supposed that the notes of the dredging company were worth anything, unless the dredge itself could be either bought in cheaply at the sale or a purchaser hunted up for it, and in that way the notes looked after and protected. Oliver Ramsay swears that it cost over $100,000, and Valentine swears that he had found two gentlemen, whom he named—Messrs. Hussy and Fenton—who were willing to purchase it at $75,000, and the plan, which seems to have been devised between him and Hugh Ramsay, was that the dredge should be bought in as cheaply as possible, and as there were some other assets in the hands of the receiver, that the dividends to be declared by the receiver on the $24,600 of notes owned by Ramsay, including those pledged to the bank, should be used, as far as possible, in paying for the dredge, and then that it should be sold to the two willing purchasers for the $75,000, or such other sum as would pay Ramsay in full and enable him to reduce his debt to the bank.

But, in order to carry out that plan, several thousand dollars in cash were necessary in order to pay off the marshal's lien and other expenses.

To accomplish all this it was necessary to obtain the consent of the president of the bank (1) for the use of its collateral notes for that purpose, and (2) to induce it to advance the cash necessary to carry the transaction through. This was done. Hugh Ramsay and his son Oliver called on Watson and Valen-

tine at the bank, and laid before Watson the plan which Ramsay and Valentine had devised, and obtained his consent thereto; and it is at the interview in which that consent was obtained that it is alleged that the contract set up by the defendants was agreed to and consummated.

Valentine, by the consent of Watson, took some $6,000 out of the bank, leaving a mere memorandum in its place, and subsequently certified his own check on his account in the bank for about as much more (which was one of his modes of embezzling money), and obtained title to the dredge.

This is all that Watson ever consented to, namely, to let Ramsay take away his collateral for the purposes just mentioned, and to allow Valentine to take the money out of the bank (which was really a loan to Ramsay) for temporary use in carrying through the project, and no doubt Watson did consent that the temporary title to the dredge should be taken in Valentine's name.

In fact, in order to properly protect the bank's interest in the collateral, and to secure the return of the $6,000 taken, as we have seen, by Valentine, it was entirely proper and simply good business that the title should have been taken in Valentine's name until it could be realized on and the money returned. [Discussion of evidence omitted by direction of vice-chancellor.]

The conclusion I arrive at is that there never was any agreement that the notes should be then and there at once credited against Ramsay's debt. Such a contract was so extremely foolish as to render it on that account highly improbable. Mr. Watson knew the value of the real estate upon which the bank held mortgages. He felt perfectly safe as to Ramsay's debt and there was no occasion for making such a bargain. Moreover, the collateral given up, as it really was, for the accommodation of Ramsay, was of so little value, in Watson's judgment, that it appears that he was entirely indifferent about it, and was perfectly willing that Ramsay should have the use of it, and to assist him in realizing on the notes by lending some more money to enable Ramsay to carry the transaction through, provided the affair could be kept so far under the control of the bank as to make it reasonably secure.

Not only was it highly improbable 'that Watson or any other officer of the bank, not secretly interested personally in the transaction, agreed to give an absolute credit for past-due promissory notes of little or no value, held by it as collateral merely, but it reaches the absurd to suppose that he or they would give an additional credit for $5,000 for a note of the same character, held by a third party as collateral for a sum of money which must be paid before the note could be obtained and used by the bank.

The result of the transaction in equity was that at the time the title to the dredge was vested in Valentine, in April, 1897, he held it as mortgagee—first, to secure the amount of cash furnished by the bank, voluntarily and involuntarily, to perfect the title; and second, to secure the $19,600 of notes belonging to Ramsay but held by the bank as collateral, and as to the balance he held it in trust for Ramsay, and this is the view of the affair most favorable to the defendants.

But here comes in an element entirely unknown to Watson or to any director of the bank.

Valentine had other schemes in his mind, entirely unknown to anybody, unless it be Ramsay.

He swears that the two gentlemen 'above named who had agreed to purchase the dredge for $75,000 finally declined so to do. What the real truth of the situation was is not easily known, as I place little reliance on Valentine's evidence; but it is quite clear that about this time he was informed that a contract was to be let by the United States government to do some dredging in the harbor of Portland, Maine, and he took measures and bid on that contract, and obtained it, and took Mr. Oliver Ramsay in with him as a partner, with the two other persons who had declined, as he swears, to buy the dredge for $75,000, and proceeded to execute the contract, and therein spent a great deal of money embezzled from the bank, and entirely failed in the job, and the dredge was sold to pay the debts.

· The effort of the defendants was to show that this whole affair was the enterprise of the bank.

I cannot adopt that theory. In the first place, it was one which the bank had no power to engage in.

In the second place, the president and every officer of the bank absolutely deny having anything whatever to do with it, and are sustained by an absence of any documentary proof to the contrary. On the other hand, Oliver Ramsay had an interest in the contract which he distinguishes from an interest in the dredge. His father must have known what was going on. In fact, his knowledge of it was not denied, and it may be that Valentine, somewhere in the history of the affair, told the father that he should have credit on the debt to the bank, not only for the $19,600 of notes pledged to the bank, but also for the $5,000 which had been pledged with Sullivan & Cromwell, and in reliance upon that promise of Valentine's, Ramsay may have tacitly consented to Valentine's going on with the dredging enterprise in Portland harbor. Certainly, it seems to me, under the circumstances of the case, that Ramsay must be held to have consented to and acquiesced in Valentine's dealing with the dredge.

It clearly appears from the evidence of President Watson that he understood that Valentine was to buy in the dredge as cheaply as possible and immediately sell it at an advance for the benefit of Ramsay, and that the bank advanced the necessary cash to finance the transaction as an accommodation to Ramsay (who, with his son, had presented the plan to Watson in plausible terms, as the evidence shows), with the full expectation that the dredge would be promptly resold at a large advance, out of which the bank would be promptly repaid the cash presently advanced and the additional profits would go to Ramsay, and enable him to make a payment on his debt to the bank.

Watson had not the least idea that the bank was farther complicated in the affair than the advance of the few thousand dollars necessary to finance the transaction, and he had no notice or suspicion that Valentine intended to retain the title to the dredge and put it to practical use.

And here comes in a matter much relied upon by the defendants, namely, the reduction in the amount of interest charged by the bank to Ramsay. The bank had printed blanks, on which

statements of the amount of interest due from debtors having demand loans from the bank were made out and sent to the debtors, and several of these were put in evidence by the defendants.

One, dated June 14th, 1897, filled up in the handwriting of Valentine and addressed to H. Ramsay, states that the interest on his demand loan, amounting to $1,813, will be due July 1st, 1897, and prompt payment of the same was requested. Now, $1,813 was the amount for six months' interest on the whole of Ramsay's debt at that time, about $55,000, without giving any credit for the $25,000 which, according to defendants' theory, should have been credited in April, 1897.

This paper is significant in that it is entirely inconsistent with Valentine's evidence that there was a contract for the credit for $25,000 in or before April, 1897. But it is quite consistent with the theory which I have formed of the true facts of the case.

The amount of this notice was charged up against Ramsay's account, and a like amount in January, 1898.

His son swears that, although the notice was received by Ramsay and produced by defendants at the hearing, yet that Ramsay did not discover the overcharge of interest until his book was written up and his vouchers returned, some time in 1898, and the son further swears that Valentine was spoken to about it, and promised to have Ramsay's account credited with the overcharge of interest, but in fact never did have it so credited.

But in January, 1898, Valentine commenced, and from thenceforward continued, to make out the semi-annual statements of interest for a reduced amount, namely, $738, being the amount due for six notes on something less than $25,000 ($5,000 in cash had been paid by Ramsay in the meantime on his indebtedness to the bank).

One of these statements was produced, with the receipt for the amount, signed "paid," by Watson.

Being examined on that subject, Watson stated that he had no personal recollection of that particular payment, but swore, in substance, that he might have signed it without knowing

what it was for or what length of time the interest stated in it covered.

When examined especially on the question of his knowledge that the semi-annual interest charges were reduced, he swears that he did not know it until very late—meaning shortly before the bank failed—and then he spoke to Valentine about it, and he understood that the whole amount was to be collected.

He was then asked by counsel for the defendants if he ever said anything to Ramsay to the effect that the amount of interest he was paying was not right, and he said he did, some time before the failure. He said he met him on the street and said something to him to the effect that the interest was not paid on the right amount, and Ramsay said he had some agreement with Mr. Valentine about it, and he (Watson) said:

"*A.* We, the bank, had no agreement with Valentine.

"*Q.* What agreement did he [Ramsay] say he had with Valentine?

"*A.* Some agreement in regard to payment of half of it—something of that kind."

From this evidence it appears clearly enough that Ramsay knew, both from the fact that after the alleged contract for credit interest was made out and charged up to him on the whole amount of his indebtedness, and from this conversation with Watson, that the bank held and claimed to hold all of his notes, without any credit on account of the dredging company's notes, and in the face of that knowledge he refrained from making any demand or taking any other measures to enforce his claim for a credit.

Another circumstance is worthy of notice. The bank held a demand note against Ramsay for $7,500, dated March 30th, 1895. This note was paid by Ramsay on January 25th, 1898, after he had learned that interest was being demanded from him on over $50,000. If he at that time understood that he had paid, not only $19,600, but $25,000, on the account of his indebtedness, it seems to me that it was a good opportunity to have had the payment actually applied and the note handed up to him. I think this defence wholly fails.

The next defence which I will notice is that the bank had no

legislative right to act as a bank, and hence all its transactions as such were void, and no cause of action accrued to it by reason of the loans made to Ramsay or any other borrower.

The Middlesex County Bank was incorporated by an act of the legislature, approved February 1st, 1872, with the privilege to continue as such for twenty years.

It went immediately into business and performed all the functions of a bank until the time it failed, in July, 1899.

In January, 1892, it took proceedings to extend its corporate existence for fifty years, under the act of April 21st, 1876. *1 Gen. Stat. p. 972 § 302.* It is argued that the act cited does not apply to banks, and that proceedings for extension were void, and that the whole proceeding was in violation of section 57 of the Banking act, which forbids unincorporated persons from conducting a banking business.

I shall not consider or discuss these arguments in detail, because I am of the opinion that the defendants are estopped from setting up this defence.

It will be observed that section 57 of the Banking act does not declare contracts for the loan of money made by a banking company, acting without legal authority, to be void. It simply prescribes a penalty upon the bank's officers.

In point of fact, this bank, up to the time of its failure, was recognized by the state government authorities as a lawful institution, and was periodically visited as such by the inspectors of the banking department.

Its right to exist and do business as a bank was never challenged by any state officer. No proceedings were ever instituted against it by the attorney-general.

It was kept open as a bank and received deposits from a great number of individuals, and thereby became indebted to them. It loaned those moneys out to a great number of other individuals, including Ramsay. The object of the present proceeding is to recover back from Ramsay that portion of those deposits which he borrowed and never repaid, for the purpose of distributing it, as far as it will go, among these creditors of the bank, and it is known to the court that there will be a deficiency for that object. In short, complainant is to be con-

sidered in equity as the official trustee and agent of the depositing creditors of the bank to recover the moneys which the bank, as a trustee for its creditors, loaned to its debtors.

The bank, as an entity, then, may be left out of view here.

In my view, it would be a reproach to the administration of justice if the illegality of the bank's corporate existence could be set up in the defence of this action. I think it does not lie in the mouth of a man who borrows money from a *de facto* bank to set up in defence to an action to recover that money that the bank has no right to exist.

The authorities cited by the complainant fully sustain his position in that behalf. *Silver Lake Bank* v. *North, 4 Johns. Ch. 370; Camden and Atlantic Railroad Co.* v. *Mays Landing and Egg Harbor City Railroad Co., 48 N. J. Law (19 Vr.) 530; Steam Navigation Co.* v. *Weed, 17 Barb. 378; Palmer* v. *Lawrence, 3 Sandf. 161; Chester Glass Co.* v. *Dewey, 16 Mass. 94, 102.*

A large number of cases to the same effect are collected in the case in *17 Barbour,* above cited.

The next point made is that the language of the mortgages is insufficient to cover these loans.

The consideration of that point necessitates an examination of those instruments and the location of the mortgaged premises.

The latter consist of two tracts of land, or, more accurately speaking, one tract of land bisected by a street. Taken as a whole, it may be described as being about seven hundred and fifty feet in length by four hundred and sixty feet in width, facing, for that distance, on Staten Island sound, and lying between Fayette street and Commerce street, which run substantially at right angles with the line of the shore, and is bounded by High street, on the west. It is bisected by Rector street, which leaves about three-fifths of the whole lot between it and the sound, and about two-fifths between it and High street.

From the north corner of the whole tract is to be deducted a small portion belonging to Mrs. Ramsay, and another small portion belonging to St. Peter's Church.

The first mortgage was given by Ramsay and wife, on the 3d of March, 1892, and covers the block between High and

Rector streets, and secures a bond in the penal sum of $60,000, with this condition:

"WHEREAS, The Middlesex County Bank is about to loan certain sums of money to the said Hugh Ramsay, to an amount not to exceed in the whole the sum of $30,000, by discounting his promissory notes drawn to his order, payable in three months from the date thereof, respectively,"

with the usual verbiage that the mortgage was to be void if the notes were paid.

The condition provides, also, for securing any renewal of such notes.

The second mortgage was given on the 10th of June, 1895, and covers a parallelogram on the east side of Rector street, bounded on the ends by Liberty and Commerce streets, and on the east side by the remainder of the whole tract.

The condition of this mortgage declares that it is given as additional security for the first mortgage.

The third mortgage is dated the 4th of December, 1895, and covers the whole tract, and refers to an accompanying bond, whose condition is as follows:

"WHEREAS, The Middlesex County Bank is about to loan certain sums of money to the said Hugh Ramsay, to an amount not to exceed in the whole the sum of seventy-five thousand dollars, by discounting his promissory notes drawn to his order, payable in three months from the date thereof, respectively,"

following precisely the language of the first mortgage, including the mention of renewals.

In fact, it is quite plain, by pencil memoranda found on the face of the first mortgage, that it was handed to the scrivener as a form for the third mortgage.

Now, the argument is that no notes at three months were ever discounted for Ramsay, but that all the loans were made on notes payable on demand, and hence were not secured by these mortgages.

I am unable to see the least force in this objection, under the circumstances of this case.

In the first place, its enforcement would result in rendering these instruments absolutely valueless, except as to the $19,600 note, in which, on its face, it is declared that it is secured by a mortgage.

In the next place, the evidence is overwhelming that these moneys were loaned on the strength of these mortgages, and Ramsay must have so understood it. It is quite impossible to believe that he could have understood anything else. To have done so he must have supposed that the bank was calling on him, year after year, to give these mortgages, one after the other, and then was willing to loan him $50,000 or $60,000 without any security whatever.

That it is quite competent for the parties to use the mortgage for a security other than that mentioned in it, is entirely clear and authoritatively settled.

Our courts have gone so far as to hold that a mortgage given for money loaned, which loan has been repaid and the mortgage delivered up to the mortgagor, may be redelivered for another and distinct loan and be entirely valid between the parties, and as against all other parties except intervening encumbrancers.

It is authoritatively settled, in this state, that it is competent to prove by parol what the real object of a mortgage is, and that it is given for a purpose not disclosed in the condition.

Among the numerous cases cited by counsel, I mention the following: *Bell* v. *Fleming, 12 N. J. Eq. (1 Beas.) 13; affirmed, Ib. 491; Robinson* v. *Urquhart, 12 N. J. Eq. (1 Beas.) 515; Flanagan* v. *Westcott, 11 N. J. Eq. (3 Stock.) 264; Hoy* v. *Bramhall, 19 N. J. Eq. (4 C. E. Gr.) 563; Farnum* v. *Burnett, 21 N. J. Eq. (6 C. E. Gr.) 87; Griffin* v. *New Jersey Oil Co., 11 N. J. Eq. (3 Stock.) 49; Silvers* v. *Potter, 48 N. J. Eq. (3 Dick.) 539; Underhill* v. *Atwater, 22 N. J. Eq. (7 C. E. Gr.) 16, 599; Lanahan* v. *Lawton, 50 N. J. Eq. (5 Dick.) 276.*

I venture the suggestion, however, that under the circumstances of this case the validity of the mortgages is of little consequence. They were of record and were notice to everybody. The debt of the mortgagor is thoroughly established and is valid and binding on his heirs-at-law. The land was sold by the administratrix to pay that debt, and all the parties defend-

ant, who claim under the conveyances of the administratrix, took, of course, with notice of the debt, and have never paid one cent to the administratrix.

She has a vendor's lien on the premises which she can enforce, and, in my judgment, the complainant, as a creditor, is subrogated to the right of the vendor's lien so held by the administratrix, and a very slight amendment to his bill would enable him to enforce that lien in this suit.

The action of the widow and the adult heirs-at-law in accepting shares of stock in place of their several rights as dowress and heirs, would be binding on them for the purpose of enforcing the vendor's lien, so that the widow's dower, for that purpose, is out of the way. The infant heir is, of course, bound by the acts of his ancestor.

I will advise a decree in favor of the complainant for the whole amount of his claim, and that it is a first lien on the premises, with one exception.

In July, 1897, Ramsay made a lease for ten years to the defendant the New York Wood Vulcanizing Company, for about one-half of the water front, at the yearly rent of $4,700, and it now claims that the bank waived its priority over that lease, as a condition to its being made. This claim is thoroughly established and frankly admitted by the counsel for the complainant. The arrangement, however, does not destroy the lien of the mortgage upon the rents as they accrue.

I will advise a decree in accordance with these views. The decree will also be subject to whatever rights the city of Perth Amboy may have with regards to the opening of the street through the premises, which it claims were reserved in the vacation of one which traversed the most valuable tract diagonally.

The contest between the defendants has not been argued and its consideration will be taken up hereafter.