GEORGE H. EARLE, receiver, &c.,

*v.*

AMERICAN SUGAR REFINING COMPANY.

[Decided September 15th, 1908.]

1. S., who owned a majority of the stock of the C. C. Co., which in turn owned a majority of the stock of the P. S. R. Co., borrowed $1,250,-000 from the A. S. R. Co., upon a pledge of such stock (among other collateral), under an agreement that the P. S. R. Co. should not be operated during the pendency of the loan. The P. S. R. Co.'s plant, which was practically, but not entirely, completed, was erected for the purpose of undertaking the same business as that in which the A. S. R. Co. was engaged. One attempt to borrow money with which to start the P. S. R. Co. was made, and proved abortive. To secure the carrying out of the agreement mentioned, the board of directors of the last-named company was organized in the interest of the A. S. R. Co., the lender corporation. The P. S. R. Co. was subsequently declared insolvent, and the complainant was appointed its receiver. He filed the bill in this cause to have the A. S. R. Co. declared trustee for the creditors and stockholders of the P. S. R. Co. because of the former's control of the plant of the latter, and asked that it account for profits alleged to have been made by and through such control. It was proved that the P. S. R. Co. was insolvent when the loan was made; that it never was a going concern, and it was not proved that it could have made profits if it had been operated.—*Held*, that a case is not made which entitles the complainant, as receiver of the P. S. R. Co., to an accounting in this court from the A. S. R. Co. for profits, as it appears that no profits were made in the transaction.

2. Where a corporation, organized under act April 21st, 1896 (*P. L. 1896 p. 277*), loaned the owner of a majority of the stock of another corporation a large sum of money, and took from him a pledge of such stock, it was a violation of the third section of such act, providing that no corporation created under the act should possess the power to carry on the business of discounting bills or notes, or of buying and selling bills of exchange, the loan, while not strictly a discounting of the note, was the "buying of a bill."

3. The "banking business," as defined by laws and customs, consists, among other things, in making loans of money on collateral security.

On bill for accounting by George H. Earle, Jr., auxiliary receiver of the Pennsylvania Sugar Refining Company, against the American Sugar Refining Company.

*Messrs. Grey & Archer, Mr. J. De F. Junkin* and *Mr. H. Snowden Marshall,* for the complainant.

*Mr. Richard V. Lindabury, Mr. John G. Johnson* and *Mr. Henry W. Taft,* for the defendant.

*Messrs. Davies, Stone & Auerbach,* for certain bondholders of Philadelphia Sugar Refining Company.

WALKER, V. C.

The bill in this case prays that it may be decreed that the defendant, the American Sugar Refining Company, on December 30th, 1903, became trustee in the control of the affairs and plant of the Pennsylvania Sugar Refining Company, for the benefit of that company and its creditors and stockholders; that as such trustee the defendant make discovery of all profits made and acquired by it by reason of its actions in controlling the affairs and plant of the Pennsylvania Sugar Refining Company, and account to the complainant as auxiliary receiver of that company for such profits; that whatever profits have been made by the American Sugar Refining Company, by reason of its actions in so controlling the Pennsylvania Sugar Refining Company, belong to, and be paid to, the complainant as such receiver, and for further and other relief. For the sake of brevity the defendant will be referred to as the American Sugar Company, and the complainant's insolvent corporation as the Pennsylvania Sugar Company.

The state of facts upon which the defendant's liability is said to arise are, succinctly stated, these: The Pennsylvania Sugar Company, a corporation, built a plant and works for the refining of sugar in Philadelphia, which plant was practically completed in the winter of 1903–1904. Its construction was commenced in or about the year 1901. The plant was erected for the Pennsylvania Sugar Company by a corporation known as the "Champion Construction Company." Mr. Adolph Segal was the owner of the majority of the stock of the Champion Construction Company, which company owned a majority of the stock of the Pennsylvania Sugar Company. He was, therefore, the master of

both.   The Pennsylvania Sugar Company's works were constructed by Mr. George M. Newhall, an engineer and general designer for manufacturing plants, including sugar refining plants, who appears to be in every way a competent man.   He testified that in the winter of 1903–1904 the plant of the Pennsylvania Sugar Company was practically finished, and that it was tested in detail.   Certain complements to the machinery, and certain supplies, however, remained to be acquired to make the plant a complete going concern, as will be hereafter mentioned.

Prior to December 17th, 1903, Mr. Gustav E. Kissel called upon Mr. John E. Parsons, the counsel and one of the directors of the American Sugar Company, concerning an application for a loan by that company to Mr. Segal.   Mr. Kissel, the defendant asserts, was Mr. Segal's agent at that time, but that he afterwards became the defendant's agent.   My judgment is that he never was the agent of Segal in any legal sense, but was always the agent of the American Sugar Company.   Segal undoubtedly acted for himself so far as he was not represented by Mr. Thomas B. Harned.   The amount of the loan asked for was $1,250,000. At an interview between Mr. Harned, counsel for Mr. Segal, and Mr. Kissel, with Mr. John E. Parsons, Mr. Parsons was informed that the loan would be secured by $1,000,000 of bonds of a property, known as the "Majestic Apartment House," in Philadelphia, by $500,000 of bonds of the Pennsylvania Sugar Company, and by twenty-six thousand shares of that company. There was a voting trust in respect to this stock, which was incomplete.   It was stated, either by Mr. Harned or Mr. Kissel, that there was to be an arrangement that the Pennsylvania Sugar Company should not run during the pendency of the loan, which was to be for a year.   On another occasion Mr. Segal was present, as well as the persons just mentioned.   It was stated that Mr. Segal was not willing to apply for consent from the other stockholders, and that he did not wish anything about the transaction in writing.   Mr. Parsons declined to have anything to do with the transaction unless all of the particulars were committed to writing.   In passing it might be observed that on the first visit of Mr. Segal in company with Messrs. Harned and Kissel to

48.

Mr. Parsons, he (Mr. Segal) stated that he understood or believed that the loan was to be made by the American Sugar Company. This fact, like the other, is not, in my judgment, of any very great importance. The fact is, as I believe, that Mr. Segal knew from the first that the loan was to be made by the American Sugar Company. In other words, I believe that, in casting about him for the procurement of a loan with which to complete his Majestic apartment house, he conceived the idea that through his virtual ownership and his actual control of a majority of stock of the Pennsylvania Sugar Company he could secure such loan from the American Sugar Company, under an agreement whereby the Pennsylvania Sugar Company was not to be run in competition with the American Sugar Company. Upon this head there is no difficulty, and I think that the defendant itself does not seriously contend otherwise.

In order to secure his client, not so much for the repayment of the loan, for which the security appeared to be inadequate, but more for the purpose of the principal object for which the loan was made, namely, that the Pennsylvania Sugar Company should not run and operate, Mr. Parsons prepared what is called in the pleadings and proofs "Mem. re Segal Loan." It provides that an agreement be made and exchanged; that a stock note be signed and securities be turned over; that Mr. Hipple (the trustee named in the incomplete voting trust agreement) must give a certificate that he holds twenty-six thousand shares subject to the control of the lender, and that he will not accept directions from the proposed committee (provided for in the voting trust agreement), or does accept notice from the majority of the stockholders; that they will not appoint, or consent to the appointment of, the committee; that the construction company notify Mr. Hipple, as depositary of the stock, that inasmuch as no names for a committee have been agreed to in the pooling agreement, as owner of twenty-six thousand shares (a majority of the stock of the Pennsylvania Sugar Company), it elects to treat the agreement as not complete, and that Mr. Hipple will be so good as to act accordingly, accepting no directions from a committee, should names for a committee be proposed, and accepting notice that the construction company, as the holder of

a majority of the stock, will not, until the notice is counter-manded in writing by the construction company or its assigns, participate in the appointment of such committee, or consent to such appointment; that Mr. Hipple acknowledge the receipt of the communication by a letter or certificate in which he shall say that he has received it, that he holds the twenty-six thousand shares of the stock of the construction company subject to the rights, if any, under the pooling agreement as thus stated, to the ownership and control of the construction company and its as-signs; that the construction company transfer the certificate with trust certificates, if trust certificates are to be issued, to Mr. Kissel under the terms of the Segal agreement; that if the stock is in the name of the construction company, it must give an irrevo-cable proxy, and should assent to whatever is the arrangement with Mr. Hipple; that changes in the board (of directors) be arranged as proposed; that the lender should be satisfied that the executive officers will obey the orders of the directors in re-spect to the running of the refinery; a note from the president of the company, addressed to Mr. Kissel, in substance or effect, as follows, will answer:

"Referring to the resolution of the directors of the Pennsylvania Sugar Refining Company, passed this day, with reference to the starting of the refinery, I wish to say that I recognize the authority of that resolution, and will act in conformity with it, subject to any change that may hereafter be made by a majority of the board of directors;"

that a resolution of the directors may be in this form:

"WHEREAS, to start the refinery at the present time would involve an outlay of a large sum of money which would need to be provided, for which the time is not opportune: *Resolved,* that the refinery do not run, and that no proceedings looking to the beginning of operations be taken until the further order of the board."

The reason I say that the principal object of the loan was to prevent the operation of the Pennsylvania Sugar Company rather than to secure a return of the money is that a corporation, no part of whose legitimate business was the loaning of money, would never have made such a loan at legal interest, unless lurk-ing behind the transaction there was some advantage of great importance to the lender. The American Sugar Company was safe. If the loan were repaid, it lost nothing, and had the ad-

vantage of no opposition from the Pennsylvania Sugar Company during its pendency. If the borrowed money were not returned, then the advantage from stifled competition was enduring, and the security was available, in case of default, with at least the possibility of the ultimate acquisition of a rival plant.

On December 30th, 1903, an agreement in writing was signed by Mr. Segal and Mr. Kissel, "as agent." It was expressed to be made between Mr. Segal, therein called the borrower, and Mr. Kissel, "as agent, his principals and assigns," therein called the lenders. It recited Mr. Segal's desire to borrow $1,250,000 upon a stock note to be given therefor, a copy of which is recited in the agreement. The form of note recited that Mr. Segal, twelve months after date, for value received, promised to pay Mr. Kissel, agent, or his assigns, $1,250,000, with interest at six per cent., having deposited with him as collateral security the following property: One thousand first mortgage bonds of $1,000 each of the Majestic Apartment House Company; five hundred first mortgage bonds of $1,000 each of the Pennsylvania Sugar Company; receipt of Mr. Hipple for twenty-six thousand shares of the capital stock of the Pennsylvania Sugar Company, the right to the stock, and all voting and other rights which belonged to it. Then followed the usual undertaking of a collateral note concerning the sale of the securities, after default, at public or private sale without advertisement or notice, &c. Then a recital that the bonds of the Pennsylvania Sugar Company, and the right to the twenty-six thousand shares of the stock of that company, and the voting and other powers which belonged to that stock, were regular, and the stock regularly issued and continued a majority of all of the stock of the company. The agreement then proceeds to recite that the bonds of the Majestic Apartment House Company are the entire issue of such bonds; that the entire issue of first mortgage bonds of the Pennsylvania Sugar Company is $3,000,000, the five hundred bonds being one-sixth of the total authorized issue; that the borrower (Mr. Segal) will so arrange that the absolute voting power of the twenty-six thousand shares of the stock of the Pennsylvania Sugar Company shall be in the lenders, who shall have the right to use such voting power as may be suitable to aid or effectuate

the purposes of the agreement, and, as the control thereby given is a material part of the consideration for the note, the borrower further agrees that he will so arrange that, of the seven directors of the Pennsylvania Sugar Company, four to be nominated by the lenders, of whom one shall be Mr. Kissel, shall be put in place of four of the present directors, and that they, or substitutes to be nominated by the lenders, shall be directors so long as any part of the loan shall remain unpaid, and that the control and possession of the property of the Pennsylvania Sugar Company shall be in such way and so effectually subjected to the control of the board of directors that so long as the note, or any part thereof, remains unpaid the refinery of the Pennsylvania Sugar Company shall only be run or operated or do business, as shall be directed by such board.

To effectuate the purposes of the agreement, and to carry out the terms of the transaction, the Champion Construction Company on the same date, December 30th, 1903, gave Mr. Kissel its proxy to vote the stock owned by it and standing in its name, which proxy is expressed to be irrevocable pending the life of the agreement mentioned. It is signed for the company by Mr. Harned, president, and is attested by its secretary. On the same date Mr. Harned wrote a letter to Mr. Hipple, which stated that, inasmuch as no names for a committee had been agreed upon, the construction company, as owner of twenty-six thousand shares of the stock of the Pennsylvania Sugar Company (a majority of the stock), notified him, as depositary of the stock, that it elected to treat the agreement as not complete, and that he would be so good as to act accordingly, accepting no directions from a committee should names for a committee be proposed. This letter Mr. Harned signed as president, stating it was by order of the board of directors. To this Mr. Hipple replied, by letter of the same date, acknowledging the receipt of Mr. Harned's communication, and stating that, as there was no committee in existence to direct him in voting the stock, and none could be nominated except by the holders of the majority of the stock, he could not exercise any right to vote the stock deposited with him until such committee of direction be appointed. This letter from Mr. Hipple to Mr. Harned, president of the Cham-

pion Construction Company, was by that company assigned, transferred and set over to Mr. Kissel, as a paper in the nature of a certificate signed by Mr. Hipple, trustee, contemporaneously with the assignment and delivery to him (Mr. Kissel) of trustees' certificates for twenty-six thousand shares of the stock of the Pennsylvania Sugar Company, under the terms of the agreement bearing date December 30th, 1906, expressed to be made between him (Mr. Kissel) and Mr. Segal. This assignment is signed for the company by Mr. Harned, as president, and is attested by the secretary. On the same day, December 30th, 1904, the board of directors of the Pennsylvania Sugar Company met, and in pursuance of the agreement that four directors should resign in the interest of the lenders, and four others, to be nominated by them, be elected in the places, four of the directors did resign, and their resignations were accepted and their successors elected, among those chosen being Mr. Kissel, according to agreement. At that meeting a preamble and resolution, reading as follows, was adopted:

"WHEREAS, to start the refinery at the present time would involve an outlay of a large sum of money, which would need to be provided, and for which the time is not opportune: *Resolved*, that the refinery do not run, and that no proceedings looking to the beginning of operations be taken until the further order of the board."

On June 16th, 1904, Mr. Harned wrote Mr. Parsons that Mr. Segal requested a return of the twenty-six thousand shares of stock against a cash payment of $100,000 on account of the loan, in which case he would enter into such guaranty as necessary to insure refinery remaining closed until October 1st, 1904; that he would pay off unconditionally the entire loan with interest to October 1st, against return of all securities; that if neither proposition be acceptable, he would like to feel free to make sale of his entire position, legal and otherwise, and it would be more satisfactory to all concerned if that be not objectionable. Segal did not pay the loan, either on October 1st, 1904, or at maturity (nor has he at any time, as it appears), and on July 6th, 1905, Mr. Parsons, representing the American Sugar Company, wrote to Mr. Untermeyer, then representing Segal, in which he said

that the sugar company (meaning the defendant) regarded Segal's Camden affair (*i. e.,* sugar refinery built by Segal in Camden) as a strike; that the company did not think or believe that Segal, or anyone else, could run the present refinery (meaning the Philadelphia refinery, of which the complainant is receiver) at a profit, but that the attempt could do harm, and to the extent of making the loan (under investigation) the company yielded, but it declined to do so if Segal was to be at liberty, by borrowing, either to run the refinery, or for any other purpose to put indebtedness ahead of the stock collateral, or to use the money obtained from the loan in any way to hurt the lender. This letter was admitted in evidence, over objection, upon the ground that it tended to contradict the verbal testimony given by Mr. Parsons; the question whether or not it amounted to an admission of the American Sugar Company's motive in making the loan being reserved by me, with the statement that it (the motive) was to be inferred from the evidence already in, notwithstanding Mr. Parsons's testimony, then the complainant did not need the letter for the purpose mentioned, otherwise the complainant did need it. Now, I have no difficulty whatever in holding, from the testimony in the cause, laying aside entirely the letter of Mr. Parsons to Mr. Untermeyer, that the motive of the defendant company in making the loan to Segal was either to stifle threatened competition, or to avoid the consequences of a "strike" by Segal, whatever that may exactly mean in the connection in which it was used. Therefore the letter is not received as evidence of any admission by the defendant. Another thing of which there can be no doubt is that the whole matter of the loan was arranged by Mr. Segal and Mr. Havermeyer, president of the American Sugar Company, before Mr. Parsons had anything to do with it. It appears that it was referred to him to arrange details and put the matter in the best legal shape his well-known talent could devise, to at once secure and disguise the loan. Whether Segal's offer to make a payment on account of the loan for a return of the stock was *bona fide* or not makes no difference. The incident does not touch the merits, and is only adverted to for the purpose of introducing Mr. Parsons's letter to Mr. Untermeyer.

What I said about Mr. Kissel being the agent of the defendant is abundantly shown by Mr. Parsons's testimony. It will be remembered that in the agreement it was provided that four directors of the Pennsylvania Sugar Company should be nominated by the lenders, of whom Mr. Kissel should be one. By that very agreement Segal and Kissel dealt at arms length, so to speak, Segal being the borrower, and Kissel, "as agent, his principals and assigns," being the lenders. Now, Mr. Parsons says that, so far as the directors were concerned, he was willing that Kissel (who he stated was Segal's broker), or anybody whom he nominated, should supply the place of those whom Segal said he controlled, remarking that they (meaning the defendant company) had confidence in Kissel, although he was Segal's broker. Later on in his testimony Mr. Parsons said that the loan was made in the name of Kissel, and the promissory note which Segal gave went to Kissel, and that it was stated, in the conversation referred to, that the arrangement was that from that time on Kissel would hold the loan for the company. If anything were wanting to show the real character of Mr. Kissel with reference to the transaction, it is supplied by the letter of Mr. Havermeyer, president of the defendant company, directed to Mr. Kissel, dated January 5th, 1904, in which he says:

"Referring to the loan made by you [Kissel] as agent for us to Mr. Segal, under the agreement of December 30th, 1903, we will hold you harmless by reason of the execution of that agreement and of any action taken under it."

This shows conclusively the character of the transaction. It was a scheme on the part of the defendant company, born of Segal's necessities, to tie up the Pennsylvania Sugar Company and prevent its operation in competition with the defendant company so long as the loan should be outstanding. And it was entered into in a secretive manner—that is, the name of the defendant company did not appear in the transaction, and the form in which the papers were cast might have protected the defendant from disclosure in any attack by third parties, or in any investigation by public authorities. But when attacked by one of the parties, or, what is the same thing, by the receiver of the

Pennsylvania Sugar Company, who was, by reason of his position, able to obtain his information of the transaction from inside sources, the proceeding is laid bare.

And now an appeal is made to a court of equity, which penetrates all disguises of form, and, disregarding the shadow, grasps the substance. *Stockton* v. *Central Railroad Co., 50 N. J. Eq. (5 Dick.) 52.* If the complainant were entitled to the relief he asks upon the state of facts which is disclosed by this cause, it would unhesitatingly be accorded to him. It is, however, conceded by the complainant that there is no precedent for the relief he prays, and I am asked to go a step further than the courts have yet done in dealing with the operations of corporations in the stifling of competition and the restraint of trade. Want of precedent would not deter me for a moment in awarding the complainant a decree if I could find law upon which to rest it. The principles of equity will be applied to new cases as they are presented, and relief will not be withheld merely on the ground that no precedent can be found. *Van Duyne* v. *Vreeland, 12 N. J. Eq. (1 Beas.) 142.* The absence of precedents or novelty in incident presents no obstacle to the exercise of the jurisdiction of a court of equity. It is no objection to the exercise of jurisdiction that, in the everchanging phases of social relations, a new case is presented and new features of wrong are involved. *Vanderbilt* v. *Mitchell, 72 N. J. Eq. (2 Buch.) 910 (Court of Errors and Appeals).* While it is true that equity will make a precedent to fit a case novel in incident, yet in my judgment the facts of the case must come within some head of equity jurisprudence. This observation is not, as I understand it, in conflict with the broad doctrine of the expansive and expanding jurisdiction of this court as laid down in *Vanderbilt* v. *Mitchell.* Each of the cases cited by Judge Dill, in the opinion of the court of errors and appeals in that case upon this head, were cases in which the facts involved were referable to some head of existing equity jurisprudence. Chancellor Pitney, in his opinion in *Bigelow* v. *Old Dominion Copper Mining and Smelting Co. (May Term, 1908), ante p. 2,* in dealing with the question of promoters' liability, says that it "is not the creature of statute; it is 'judge-made' law, in the sense that courts of equity everywhere, recognizing the obliga-

tions arising from the fiduciary relation, have applied to it the same principles of equity that obtain in all cases of trust." This, as I read it, is but another declaration to the effect that known principles of equity will be applied to new cases as they arise, and that the expansion of equity goes to new facts, not that it calls into being new principles.

The doctrine invoked here is the right to an accounting, and that right must be denied, unless the complainant can show, under the law, that he is entitled to an accounting. Because the American Sugar Company loaned the owner or controller of a majority of the stock of the Pennsylvania Sugar Company a large sum of money, and took from that owner a pledge of that stock and an agreement whereby the Pennsylvania company could not be run and operated in competition with the American company during the pendency of the loan, will not entitle the complainant to an accounting, unless the more ancient law, or the more recent policy of the state, affords the remedy which the complainant seeks. I cannot make law. I can only apply it. This observation is probably subject to this exception, namely, I can make law by the application of existing principles to new cases. Nevertheless, I cannot call into being principles which have no existence in equity, the common law, the statute law, or what may be called the "public policy of the state." The legislature may make public policy, but not the courts. *Trenton Potteries Co.* v. *Oliphant, 58 N. J. Eq. (13 Dick.) 507, 524; Dittman* v. *Distilling Company of America, 64 N. J. Eq. (19 Dick.) 537, 545; 54 Atl. Rep. 570.*

It ought to be observed in passing that it was no part of the business of the American Sugar Company to loan money. The objects for which the company was formed are the purchase, manufacture, refining and sale of sugar, molasses, and melada, and all lawful business incident thereto. These are the only objects expressed in the charter under which this corporation was organized, and its charter limits its powers. *Robotham* v. *Prudential Insurance Co., 64 N. J. Eq. (19 Dick.) 673, 682.* The loan to Segal was in direct violation of the third section of our Corporation act, April 21st, 1896 (*P. L. 1896 p. 278*), which provides, among other things, that no corporation created under the provisions of the act shall, by implication or construction, be

deemed to possess the power of carrying on the business of discounting bills, notes or other evidences of debt, or of buying and selling bills of exchange. While the loan to Segal was not, strictly speaking, the discounting of a note, it undoubtedly was the buying of a bill, within the meaning of the section. In other words, it was the doing of a banking business, as the loan was not made by the company for its own benefit in the course of its own business. This section is understood to be a prohibition against the exercise of banking powers by companies organized under our General Corporation act. The business of banking, as defined by law and custom, consists, among other things, in making loans of money on collateral security. *1 Boll. Mod. L. Bank. 2,* citing *Mercantile Bank* v. *New York, 121 U. S. 138, 156; 7 Sup. Ct. 826; 30 L. Ed. 895.* The transaction under investigation falls directly within the definition of banking just adverted to; that is, it was a loan of money upon collateral security. The supreme court in *McCarter, Attorney-General,* v. *Imperial Trustee Co., 72 N. J. Law (43 Vr.) 42, 45,* that the third section of our act is a regulation of and limitation upon all corporations, and is not confined to corporations created under the act of 1896. Besides an exactly similar provision existed in the Corporation act of 1875, under which the defendant company was organized. *Gen. Stat. 1895 p. 910 § 4.* It was incorporated by certificate filed in the office of the secretary of state January 10th, 1891. The loan was an act clearly *ultra vires.* Of course, Segal could not take advantage of this situation. He got the company's money, and estoppel would prevent his defending a suit for its recovery. His obligation was clearly enough to repay. The doctrine of *ultra vires,* when invoked for or against a corporation, is not allowed to prevail where it would defeat the ends of justice or work a legal wrong. *Ohio and Mississippi Railway Co.* v. *McCarthy, 96 U. S. 258; 24 L. Ed. 693.* The plea of *ultra vires* is not admitted, except where it is practicable to restore the *status quo ante. Rutherford* v. *Hudson River Traction Co., 73 N. J. Law (44 Vr.) 227, 235; Campbell* v. *Perth Amboy Shipbuilding Co., 70 N. J. Eq. (4 Robb.) 40, 57; 62 Atl. Rep. 319.* The loan would have been legitimate had it been made to advance the corporation's business. *Whitehead* v. *American Lamp and Brass Co., 70 N. J.*

*Eq.* (*4 Robb.*) *581, 585; 62 Atl. Rep. 554.* While the transaction under investigation is illegal and reprehensible, the only penalty, so far as I am aware, which might be visited upon it for its excess of corporate power would be the forfeiture of its charter. If a corporation violates its charter or the laws of the state, it is liable to proceedings to forfeit its charter. *Camden and Atlantic Railroad Co.* v. *May's Landing, &c., Railroad Co., 48 N. J. Law* (*19 Vr.*) *530; Elizabethtown Gas Light Co.* v. *Green, 46 N. J. Eq.* (*1 Dick.*) *118; Attorney-General* v. *American Tobacco Co., 55 N. J. Eq.* (*10 Dick.*) *352; Phillipsburg Electric Co.* v. *Phillipsburg, 66 N. J. Law* (*37 Vr.*) *505, 507.* This, however, is a matter which concerns the state alone. Should the loan, or any part of it, be ultimately lost to the defendant company, its officers who authorized the transaction would undoubtedly be liable as for a waste or misapplication of corporate funds. *Citizens' Loan Association* v. *Lyon, 29 N. J. Eq.* (*2 Stew.*) *110; Id., 30 N. J. Eq.* (*3 Stew.*) *732; Williams* v. *Riley, 34 N. J. Eq.* (*7 Stew.*) *401; Ackerman* v. *Halsey, 37 N. J. Eq.* (*10 Stew.*) *361.*

The complainant contends that the defendant, under the contract of loan, put those who would do its bidding upon the board of directors of the Pennsylvania Sugar Company, and controlled that company as against the interests of its minority stockholders, and that the defendant is therefore bound to account for the profits it made in the transaction. To this doctrine, thus broadly stated, I assent. But my trouble is to find that the complainant has made a case which shows him to be entitled to an accounting upon the theory that profits were made by the defendant company in consequence of its illegal act. To better apply the law upon this branch of the case the facts with reference to the situation of the Pennsylvania Sugar Company at and before the making of the agreement and loan should be understood. They were these: Assuming its plant to have been practically complete in the winter of 1903-04, as stated by Mr. Newhall, its architect and builder, nevertheless, it clearly appears from the evidence that the refinery could not have been operated economically without an expenditure of about $150,000 for boneblack, filter bags, tools and sundries. The company's treasury was empty, and all its prop-

erty was mortgaged for $3,000,000, the refinery and its lands being worth approximately $1,370,000; that is, if the cost of the refinery (about $1,075,000 or $1,080,000) and the value of the land (about $293,600) are a criterion of its value, and that is the evidence of value in the case. Taxes on the property were in arrears since the year 1899, and no interest had been paid upon the bonds which were issued. The company was therefore insolvent, and, apparently, hopelessly so. At least one attempt was made to operate the Pennsylvania Sugar Company. Mr. Cook, who had a knowledge of the sugar business as a lender of money on raw and refined sugars, investigated the refinery, its capacity to produce the refined product, its probable earnings, and dealt with his associates looking toward the making of a loan to enable the company to start business. Application was made to Mr. Cook through Mr. Sparhawk, a broker, for a loan of $750,000 with which to commence the operations of the refinery. Mr. Cook's deliberate judgment appears to have been that at least twice that amount of money, or $1,500,000, was requirable for the purpose. The terms upon which Mr. Cook and his associates appear to have been willing to make the loan were such as the company apparently could not accept, and the loan was not made. The terms were hard on the company. They were that the stock of the company was to be put under control of the lenders so that they could control the running of the plant. The interest on the bonds was to be postponed for eighteen months, and raw material and material in process of manufacture were to be subject to a lien for the money of the lenders. They were to name the manager of the plant. There was to be a voting trust with reference to the stock. The lien upon the material, raw and manufactured, was to continue until the product was sold. The lenders were to have supervision of the sales, so that no funds should be diverted from them. The application for this loan was made by Mr. Sparhawk, as counsel for the Pennsylvania Sugar Company, the Champion Construction Company and Adolph Segal—the same parties exactly who figure in the loan transaction under consideration. They were unwilling to accept, for the benefit of the Pennsylvania Sugar Company, the harsh terms proposed by Mr. Cook, though afterwards, for the benefit of Segal alone, they ac-

cepted the still harsher ones imposed by the American Sugar Company.

We have now reached the last analysis in the facts of this case, and it remains only to apply the law arising upon those facts. As already remarked, the complainant may prevail, if prevail he can, by calling upon the defendant to account. The cases cited by the complainant do not support his contention. For instance, in *Docker* v. *Somes, 2 Myl. & K. 655,* the executors of the decedent continued his business, gradually closing it out. They went into the same business themselves, and used the money of the estate in their enterprise. They accounted for the moneys, and charged themselves with interest on the same, and the court held that they were chargeable with the actual profits that they made by use of the trust funds in their business. Manifestly that case has no application to the one *sub judice.* The numerous cases relied on by the complainant do not, in my opinion, any more nearly apply to the facts of the case under consideration than does *Docker* v. *Somes,* to which allusion has just been made. Vice-Chancellor Reed said, in *Clark Thread Co.* v. *William Clark Co., 55 N. J. Eq. (10 Dick.) 658* (at *p. 667*) ; *37 Atl. Rep. 599,* that a decree for an accounting could only go if it appeared that there was something for which the defendant was liable to render an account. In *Bergmann* v. *Macmillan, L. R. 17 Ch. Div. 423,* Mr. Justice Fry held that an account of profits will not be directed if it is clear that no profits have been made. On a bill for an accounting the court must always decide in the first instance whether or not there is anything for which the defendant is liable to account, and will not, I take it, direct an accounting in any transaction unless the evidence discloses the profits were made. Surely an accounting will not be directed for the business of a company which never commenced operations, and certainly not unless it be shown that the concern, if operated, could have made profits. The language of Chief-Justice Green, speaking for the court of errors and appeals in *Campbell* v. *Campbell's Administrator, 8 N. J. Eq. (4 Halst.) 738* (at *p. 743*), is particularly apposite. He said: "But if the court be satisfied that there is nothing due, no ac-

count will be decreed. The chancellor must first be satisfied that the complainant is entitled to have an account taken. If he be satisfied upon that point, the practice is to refer it to a master to state the details of the account, and ascertain the balance. But the chancellor may, if he sees fit, take the account himself. In this case, however, I understand the chancellor to say that the complainant is upon the evidence not entitled to an account. He not only may, but ought to refuse an account, if he be satisfied upon the evidence that nothing is due the complainant, or that for any cause an account ought not to be decreed. * * * Now, the chancellor does not, as has been insisted, arrive at his conclusion by examining an account and then refusing an account. He arrives at his conclusion by evidence independent of the account." In *Stout* v. *Seabrook's Executors, 30 N. J. Eq. (3 Stew.) 187,* an accounting was denied by Vice-Chancellor Van Fleet, who remarked (at *p. 193* of *30 N. J. Eq.*), that if, in an action for an account, the court is satisfied nothing is due from the complainant to the defendant, no further proceedings will be permitted, but the bill will be dismissed, citing *Campbell* v. *Campbell's Administrator, ubi supra. Stout* v. *Seabrook's Executors* was affirmed for reasons given in the court below. *32 N. J. Eq. (5 Stew.) 826.* This court, in case of equity cognizance, may award damages. *Ackerman* v. *Halsey, 37 N. J. Eq. (10 Stew.) 357, 366; affirmed, Halsey* v. *Ackerman, 38 N. J. Eq. (11 Stew.) 501, 509.*

Aside from the trustee aspect of this case, the accounting feature involves the law of loss of profits, which is usually to be found in cases sounding in contract or in tort. The law concerning speculative, remote and contingent profits is here applicable. They are never allowed, as I understand it, in either class of cases. In *Poll. Torts (6th ed.) 538 (1901),* it is laid down:

"With regard to the measure of damages, the same principles are, to a great extent, applicable to cases of contract and of tort. * * * The rule with regard to remoteness of damage is precisely the same whether the damages are claimed in actions of contract or of tort."

And (at *p. 540*):

"One point may be suggested as needful to be borne in mind to give a consistent doctrine. Strictly speaking, it is not notice of apprehended consequences that is material, but notice of the existing facts, by reason whereof those consequences will naturally and probably ensue."

In *States* v. *Durkin, 65 Kan. 101; 68 Pac. Rep. 1091,* it was held: "Before one may recover damages, occasioned by the wrongful acts of another, for loss of profits to an established general business, it must be made to appear that the business had been in successful operation for such period of time as to give it permanency and recognition, and that such business was earning a profit which may reasonably be ascertained or approximated." In *Kenny* v. *Collier, 79 Ga. 743; 8 S. E. Rep. 58,* it was held (at *p. 747* of *79 Ga.,* at *p. 60* of *8 S. E. Rep.*) : "That anticipated profits from a business intended to be carried on  *  *  * cannot be allowed is as well settled as anything can be in an age of legal skepticism." These cases of *States* v. *Durkin* and *Kenny* v. *Collier* were contract cases, but *Dudley* v. *Briggs, 141 Mass. 582; 6 N. E. Rep. 717; 55 Am. Rep. 494,* was a tort case, in which the court held (at *p. 586* of *141 Mass.,* at *p. 720* of *6 N. E. Rep.; |55 Am. Rep. 494*) : "Until the plaintiff had entered upon the compilation of the directory for 1885, we do not think there was any business of publishing a directory for 1885 carried on by the plaintiff, or anything that, for example, could have been sold as a going concern by an assignee in insolvency, if the plaintiff had become an insolvent debtor." And (at *p. 587* of *141 Mass.,* at *p. 721* of *6 N. E. Rep.; 55 Am. Rep. 494*) : "The fatal objection to the present case is that it is entirely problematical whether the plaintiff would actually have published a directory if the defendant had not made the fraudulent misrepresentations alleged. The plaintiff abandoned his intention to compile and publish a directory in consequence of the defendant's acts, but this, upon the principle stated in *Bradley* v. *Fuller, 118 Mass. 239,* and the cases therein cited, is not sufficient to support an action." Among the cases cited in *Bradley* v. *Fuller,* just referred to, is that of *Wellington* v. *Small, 3 Cush. (Mass.) 145; 50 Am. Dec. 719,* wherein the court said (at *p. 149* of *3 Cush. (Mass.)* : "The uncertainty of the plaintiff's damage seems, of itself alone, to be a sufficient reason for his not

recovering. In an action on the case *ex delicto* the plaintiff must show injury and damage, and these must be shown as facts by legal proofs, except in a few cases, where, by the rule of law, damage is presumed from the act complained of. This case does not fall within that exception. How could this plaintiff prove that he suffered from the acts of the defendant, which are averred in the declaration? How could he prove that he would have secured his debt by attaching the property of his debtor, if the defendant had not intermeddled with it? Other creditors might have attached it, or it might have been stolen or destroyed while in the debtor's possession. The fact that the plaintiff has suffered actual damage from the defendant's conduct is not capable of legal proof, because it is not within the capacity of human knowledge, and cannot be shown by human testimony. It depends on numberless unknown contingencies, and can be nothing more than a matter of conjecture."

And now, finally, the case on the law of accounting may be summarized as follows: That the Pennsylvania Sugar Company was not a going concern at the time its stock was hypothecated; that its business had never been established; that it cannot be postulated that, if its business had been established, it would have been profitable, but, on the contrary, it is entirely problematical whether its business would have been successful in the fierce competition it would necessarily have encountered from the defendant company; that, while the complainant may have shown injury to his insolvent corporation, he has not shown damage; that if damage has been suffered, it has not been proven, because it is incapable of proof; that anticipated profits from a business intended to be, but actually not, carried on, cannot be allowed.

Upon the whole case, I am constrained to the conclusion that nothing has been shown to be due from the defendant to the complainant, and that consequently the complainant is remediless, and therefore his bill must be dismissed, with costs.